**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **CHAMPION LOCAL SCHOOL DISTRICT,** | Case No. _____ |
| **Plaintiff,** | |
| **V.** | |
| **MICROSOFT CORPORATION,** **MOJANG AB, and** **ROBLOX CORPORATION,** | **COMPLAINT FOR DAMAGES** |
| **Defendants.** | **JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES

1. Plaintiff Champion Local School District, by and through the Champion School District Board of Education (collectively, "Plaintiff"), files this Complaint against Defendants Microsoft Corporation, Mojang AB, and Roblox Corporation, (collectively, "Defendants") to recover damages, pursuant to and under the laws of the State of Ohio, arising from the excessive and compulsive use of Defendants' products by Plaintiff's students as a result of Defendants' conduct with respect to their video game products, including but not limited to the implementation of addiction-generating behavior modification and concealment of the dangers of excessive video game use. Defendants contributed to a deepening mental health crisis among America's youth and then left public school districts, like Plaintiff, to bear the burden. In support thereof, Plaintiff alleges and states as follows:

## I.    NATURE OF THE ACTION

2. America's students are facing a mental health crisis caused by excessive and compulsive video game use that school districts across the country, like Plaintiff, are battling from the

front lines. Predictably, this crisis, of Defendants' own making in their quest for profit, was tragically --- and effectively --- brought to the doorsteps of Plaintiff's schools by Defendants.

3. All Defendants' respective Video Game Products incorporate psychological techniques into their game designs to intentionally make their video game products addictive to youth to capitalize on the monetization of children's video game play. Defendants knew of the documented harms associated with these features and continuous video game play, and failed to disclose these facts to Plaintiff and the public. Defendants' video games formed a gateway to video game addiction and left school districts, which are on the front lines of the many challenges facing America's youth, with the dauntless task of responding to the crisis of video game addiction.

4. Public education has long been a cornerstone of an equitable society. Beyond academics, schools have a duty to support students' mental health in a safe, nurturing environment and to teach healthy life skills—including navigating the digital world. Today, school districts are primary providers of youth mental health services, a vital part of their public mission to educate and protect students.

5. However, public school districts like Plaintiff are facing serious disruptions to their core missions, caused by Defendants' design, development, production, operation, promotion, distribution, and marketing of addictive and dangerous video games targeting minors. Defendants' conduct has caused school districts to divert already-limited resources to address the mental health crisis Defendants caused, including expanded counseling, learning support, and efforts to curb excessive in-school gaming and its harmful effects. Schools now face a relentless battle to protect children's wellbeing with scarce funds against Defendants' virtually unlimited resources—a fight they cannot afford to lose.

6.  In short, school districts are on the front lines of redressing the damage caused by Defendants' deliberate choice to design, develop, operate, promote, distribute, and market the video game products that attract and addict youth.

7.  Defendants compounded their failures by representing to Plaintiff and the general public that their video game products were educational, beneficial for STEM curricula, and safe for young people, including those students younger than the advertised age limit for their respective products.

8.  Plaintiff brings claims for strict liability (and, alternatively negligence) arising from Defendants' unreasonably dangerous video game products and their failure to warn of such dangers, along with negligence claims focused on Defendants choices and conduct separate from the defects of their products. Defendants knew, or in the exercise of ordinary care, should have known that their video game products were harmful to their minor users and failed to re-design their products to ameliorate these harms or warn users and the public of the foreseeable use of their products. Defendants intentionally created harmful products but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring. Plaintiff has in turn been harmed as a school district serving many youths suffering from these mental health and physical injuries.

9.  Plaintiff also brings claims for the fraudulent misrepresentations and concealment Defendants engaged in to prevent the discovery of the scheme to profit off of the mental health crisis they have created in children like those served by Plaintiff.

10. As described in more detail herein, the harm incurred by Plaintiff and caused by Defendants' wrongful conduct includes, but is not limited to, expending, diverting, and increasing human and financial resources to: prevent video game use during school; hire counselors and other

3

professionals to address video game addiction and its negative impact on youth; address consistent and pervasive disruption to the learning process caused by video game addiction in schools; hire additional personnel, and address the overall youth mental health crisis caused by Defendants' conduct and products.

11. This litigation seeks to hold Defendants accountable for deploying behavioral modification systems without adequate warnings or safeguards, harming America's youth, schools, and communities. While Defendants profit, local school districts across the nation, including Plaintiff, are left footing the bill for assisting America's struggling youth. Defendants' deliberate choices exposed minors to the dangers of excessive video game use, directly and proximately causing the injuries and damages detailed herein.

## II.    PARTIES

12. The Champion Local School District Board of Education is, and at all times relevant to this action was, a body politic and corporate pursuant to R. C. 3313.17 and, at all times relevant to this action, was a citizen and resident of the state of Ohio, with its principal corporate office located in Trumbull County, Ohio.

13. Plaintiff Champion Local School District ("herein Plaintiff") is, at all times relevant to this action, a local school district pursuant to R.C. 3311.03 and a citizen and resident of the state of Ohio, with its principal corporate office located in Trumbull County, Ohio. Plaintiff contains three public schools serving more than 1,300 students.

14. Defendant Microsoft Corporation ("Microsoft") is a foreign corporation with its principal place of business at One Microsoft Way, Redmond, Washington 98052.

15. Microsoft is a video game developer and publisher that, at all times material herein, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled,

4

prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and Xbox system either directly or indirectly, to multiple local school districts and to members of the public within the State of Ohio, including Plaintiff.

16. At all times material herein, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Minecraft and Xbox products – to multiple local school districts and to members of the general public within the State of Ohio, including Plaintiff. At all relevant times herein, Microsoft was vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

17. At all times material herein, specifically including the present, Microsoft is a foreign business corporation authorized to conduct business in Ohio, Registration No. 856592.

18. Defendant Mojang AB ("Mojang") is a Swedish company with its principal place of business at Söder Mälarstrand 43, 118 25 Stockholm, Sweden.

19. Mojang is a video game developer and publisher that, at all times material herein, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to local school districts and members of the general public within the State of Ohio, including Plaintiff. At all relevant times herein, Mojang was vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

20. In September 2014, Defendant Microsoft acquired Defendant Mojang and its intellectual property (including Minecraft) for $2.5 billion. Accordingly, Defendant Mojang is now a wholly owned subsidiary of Defendant Microsoft.

21. Although Mojang initially developed, sold, and maintained Minecraft, following its acquisition by Microsoft, both Microsoft and Mojang have played direct roles in changes made to the design, development, testing, assembly, manufacturing, publishing, publishing, packaging, labeling, preparation, distribution, marketing, supply, and/or sale of the Minecraft video game series. Indeed, both Mojang and Microsoft are responsible for the addictive design features in Minecraft described more fully herein. Both Mojang and Microsoft have direct liability for the harm and injuries caused by Minecraft based on their own conduct.

22. At all times material herein, specifically including the present, Mojang is and has been a foreign business corporation. As a direct and specific result of its continuous and repeated business activities, described in greater detail hereinabove and incorporated herein by reference as if fully restated in this paragraph, Mojang transacted business in Ohio and purposefully established minimum contacts in Ohio sufficient to subject itself to personal jurisdiction in Ohio. See, e.g., R. C. 2307.382.

23. Defendant Roblox Corporation ("Roblox Corp.") is a Nevada corporation with its principal place of business at 3150 South Delaware Street, San Mateo, California 94403.

24. Roblox Corp. is a video game developer and publisher that, at all times material herein, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, and/or prepared Roblox at their California office. Roblox Corp. also distributed, marketed, and/or supplied Roblox, either directly or indirectly, to local school districts and members of the general public in Ohio, including Plaintiff. At all relevant times herein,

Roblox Corp. was vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

25. At all times material hereto, specifically including the present, Roblox Corp. is and has been a foreign business corporation. As a direct and specific result of its continuous and repeated business activities, described in greater detail hereinabove and incorporated herein by reference as if fully restated in this paragraph, Roblox Corp. transacted business in Ohio and purposefully established minimum contact in Ohio sufficient to subject itself to personal jurisdiction in Ohio. See, e.g., R.C. 2307.382.

26. Collectively, Defendants' respective video game products at issue in this suit include Roblox, Minecraft, and Microsoft's Xbox system which includes hardware and Xbox Live software.

### III.     JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

27. Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

28. This suit alleges causes of action seeking relief arising under the laws of the state of Ohio, including but not limited to the allegation that as a direct and proximate result of Defendants' Products and Defendants' negligent, deceptive, willful, immoral, reckless, and unlawful actions and inactions, representations, and misrepresentations, including by omission, Plaintiff suffered, and continues to suffer, injuries and damages. Plaintiff has suffered, and continues to suffer, both injuries and damages within the state of Ohio that exceed the sum or value of $75,000.00, exclusive of interest and costs.

29. This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332(a) because the controversy is between citizens of different states and the amount in controversy exceeds $75,000.00.

30. This Court has specific personal jurisdiction over Defendants because they have each established sufficient minimum contacts in, to, or with the state of Ohio because each transacted business in Ohio and regularly conducted business in Ohio from which they respectively derive substantial revenue. Defendants do substantial business in Ohio and, more specifically, within the Northern District of Ohio, advertise in this district, and receive substantial compensation and profits from their Products within this District. Furthermore, Defendants purposefully and intentionally directed their activities to the residents of Ohio, and purposefully and intentionally availed themselves to the benefits and protections of the laws of the state of Ohio, and the market of the state of Ohio, and continue to avail themselves in that manner. The controversy in this action is directly affiliated with, related to, and arises from Defendants' contacts with the state of Ohio such that the exercise of personal jurisdiction over each Defendant by this Court is consistent with traditional notions of fair play and substantial justice and is both reasonable and proper.

31. Defendants expected or should have expected that their business activities could or would have could or would have consequences within the state of Ohio, as well as throughout the United States.

32. Microsoft may be served with process through its registered agent, Corporation Service Company, 1160 Dublin Road, Suite 400, Columbus, OH 43215.

33. Mojang and Roblox Corp., as unlicensed foreign business corporations, may be served with process through the Ohio Secretary of State pursuant to R. C. 1703.191 at the following

8

address: Ohio Secretary of State, ATTN: Paralegal Division – Service of Process, 180 Civic Center Drive, Columbus, OH 43215. See, e.g., R. C. 2307.382.

34. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because, among other things: (a) each Defendant directed its activities at residents in this District; (b) each Defendant conducted substantial business in this District; and (c) a substantial part of the counts giving rise to this action occurred in this District. For the same reasons, Divisional Assignment to Youngstown is appropriate.

## IV.    GENERAL FACT ALLEGATIONS
### A.  OPERANT CONDITIONING AS A TRADITIONAL THERAPY

35. The games subject to this litigation have incorporated "operant conditioning," which is a type of psychological treatment also called instrumental conditioning and a learning process in which voluntary behaviors are modified by association with the addition (or removal) of reward or aversive stimuli. The frequency or duration of the behavior may increase through reinforcement or decrease through punishment or extinction.[1]

36. Instrumental conditioning is psychological treatment traditionally used to address or treat excessive maladaptive behaviors that a patient wishes to extinguish such as smoking and overeating,[2] or alternatively to increase a behavior that is not occurring enough, such as eating enough, lack of focus to study and correcting lack of personal hygiene.

---

[1] https://en.wikipedia.org/wiki/Operant_conditioning
[2] https://www.ebsco.com/research-starters/health-and-medicine/operant-conditioning-therapies



37. The American Psychological Association adopted a Code of Conduct that recognizes and requires that the Doctrine of Informed Consent is required to deploy operant conditioning, that authorized legal consent is required, and that behavioral psychologists must take reasonable steps to protect a patient or subjects individual rights and welfare.[3]

### 1.  Traditional Operant Conditioning

38. Ethical use of operant conditioning in compliance with the APA Code of Conduct is used to reduce unwanted and undesirable behaviors, such as eating disorders, chain smoking, and autism treatment to extinguish negative behavior.[4] Alternatively, operant conditioning may be ethically applied to increase a behavior that is not occurring enough, such as eating enough, lack of focus to study, and correcting lack of personal hygiene.[5]

39. The problem behavior is first observed and recorded as it naturally occurs in a variety of settings, and no attempt is made to modify the behavior. The therapist may conduct the observation and record the behavior. This part of the behavior modification program, called

---

[3] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf
[4] *Id.*
[5] Palm, supra note 12.

baseline observation, provides a record of where and when the behavior occurred and includes duration and intensity.

40. Behavioral measures are often plotted on a graph to provide a visual record of behavior. The baseline data are used to define the problem or target behavior as precisely as possible. The client and therapist also define the desired changes in this target behavior and set up specific behavioral goals to be met during treatment.

41. This degree of precision in behavior analysis is rarely found in traditional psychotherapy. Behavioral observation continues throughout the treatment phase of the behavior modification program and changes from the baseline level are recorded. Examination of this ongoing record of behavioral progress allows both therapist and client to evaluate the effectiveness of the treatment throughout the treatment process. If behavior is not changing in the desired direction or pace, the treatment program can be altered or adjusted.

42. The American Psychological Association ("APA") adopted a Code of Conduct that recognizes and mandates that the doctrine of informed consent is required to deploy operant conditioning, requires authorized legal consent by a patient, and requires behavioral psychologists to take reasonable steps to protect a patient or subject's individual rights and welfare.[6]

43. A licensed therapist must follow the applicable standards, including the APA Code of Conduct guidelines, in crafting an operant conditioning model to change a person's behavior, which

---

[6] American Psychological Association, *Ethical Principles of Psychologists and Code of Conduct* (effective June 1, 2003), available at https://www.apa.org/ethics/code (last visited Jan. 19, 2026).

must include the informed consent of the subject patient that is having their own behavior modified.[7]

### 2. Defendants' reckless, negligent, and/or unethical application of operant conditioning.

44. As with other behavioral psychology techniques, ethical rules require knowledge, participation and informed consent of the subject whose behavior is being changed.

45. In contrast to traditional use of operant conditioning to extinguish negative behavior, the Defendants have engaged unethical, reckless, and/or negligent behavioral psychologists to change human behavior by utilizing operant conditioning in game design to target the desired behavior of "Continuous Video Game Play" without informed consent of parents, schools, or gamers in violation of the applicable standards, including the APA Code of Conduct.[8]

46. Defendants each employed licensed psychologists and/or psychiatrists to create operant conditioning behavior modification systems for their Products without disclosing or warning that such psychological techniques were being used or of the risks associated with that use, failing to obtain meaningful informed consent to exposure to these systems.

47. The use of operant conditioning in gaming goes beyond increasing sales. Instead, the application of operant conditioning is used with the primary goal of increasing sessions and length of time of video game play. The goal was continuous game play in the setting of game monetization in which profit increases with time in game, to the detriment of gamers.

48. Defendants, with the assistance of unethical behavior therapists and psychologists, used beta versions of Minecraft and Roblox, with children as game testers to incorporate operant

---

[7] American Psychological Association, supra note 11.

[8] *Id.*

conditioning behavior modification systems into their Products' design to ensure the continuous play was achieved at game launch.

49. Defendants monetarily incentivized the willing participation, and disregard of their ethical standards, of licensed psychologists in this reckless, negligent, and unethical abuse of treatment modality.

50. As early as 2012, the American Psychology Association ("APA") embraced the income potential for their members and abandoned and disregarded their organizations own Code of Conduct by promoting the employment of psychologist for video game development to their members.

51. Quoting an article published in the American Psychological Association:

> Psychologist Tim Nichols, PhD, loved video games as child. "Like any red-blooded American kid, I was playing on my Nintendo back in the 1980s and was a Sega guy in the '90s," he remembers. Now he gets paid to play. As "user research lead" at **Microsoft Studios**, Nichols is one of a growing number of psychologists in the video game industry. With the number of games and platforms exploding, companies that design and develop video games are increasingly turning to psychologists for help analyzing data and making sure their products are as effective as they can be. Some psychologists are even launching consulting businesses to assist game manufacturers or creating games of their own.[9]

52. When an organization employs a behavioral psychologist, that psychologist still has a duty to do no harm.[10]

53. The psychologist hired by the Defendants had a conflict between their applicable standards, including the APA Code of Conduct, because the Defendants used the assistant of psychologists to elicit the behavior of continuous game play, which did harm many gamers

---

[9] https://www.apa.org/gradpsych/2012/01/hot-careers; Rebecca Clay Video Game Design and Development: Video Game Companies are increasingly tapping psychologists' expertise to make games even more compelling, challenging and fun. American Psychological Association

[10] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf

and no steps were taken to inform gamers of the operant conditioning, the targeted behavior or protect the gamers from the harm of video game addiction.

54. APA Code of Conduct mandates that a conflict between organizational demands of a psychologists require acknowledgement of the conflict and "under no circumstances may this standard be used to justify or defend violating human rights. [11]

55. Likewise, the duty of care owed by each Defendant precludes violating human rights or facilitating the violation of human rights, particularly to increase profit.

56. Parents, gamers, and schools like Plaintiff are not aware that operant conditioning is being used on the players and that no steps, such as disclosure of operant conditioning, disclosure that the targeted behavior was continuous play, nor adequate tracking of game play hours was utilized in game design to protect gamers from the harm of addiction and the sequalae of addiction

57. In sharp contrast to traditional uses of operant conditioning, the Defendants have used unethical, reckless, and/or negligent methods of creating negative maladaptive behaviors in children.

58. The behaviors Defendants have sought to elicit do not pass muster under any applicable standards, including ethical standards binding on licensed therapists, because operant conditioning, intended to treat maladaptive behavior was instead twisted to create maladaptive behaviors.

59. The traditional operant conditioning procedures were inverted so that the behavior of gamers was studied and recorded to create excessive maladaptive behaviors, including but not limited to video game addiction, impulsivity, decreased ability to focus in class, inability to track or

---

[11] *Id.*

conceptualize time spent in a video game, inability to finish tasks and prioritize important tasks, and increased social isolation leading to anxiety and depression,  increasing the suicide risk for extreme gamers.

60. Upon information and belief, the APA with full backing by the Defendants and the Entertainment Software Association ("ESA") supported suppression and identification of video game addiction instead opting to call the addiction "Internet Gaming Disorder." This patient abandonment has led to a lack of diagnosis and treatment for children suffering from video game addiction.

## B. OPERANT CONDITIONING IN VIDEO GAMES BEHAVIOR MODIFICATION SYSTEMS IN THE CONTEXT OF VIDEO GAME PRODUCTS

### 1. Historical Development and Modernization of Video Games

61. Video games were first developed in or around the 1950s.

62. Initially, games were only available to be played by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

63. By the late 1990s and early 2000s, there were multiple at-home video game consoles, such as Xbox, PlayStation, and Nintendo's Wii, making video games easily accessible to most users from the comfort of their living room. Over the next ten years, video games moved to mobile devices and tablets, once again increasing accessibility to gameplay.

64. Many video games – including Minecraft and Roblox – can now be played on multiple different consoles, mobile devices, and tablets.

65. Moreover, video games can be delivered to these consoles, mobile devices, and tablets in several diverse ways, such as physical discs, digital downloads, school laptops, online gaming networks, and cloud gaming services.

66. In 2024, there were 1.17 billion gamers online, and global gaming revenues are at least $176.06 billion.[12]

67. Video gaming is an integral aspect of adolescent life in the US, with recent estimates suggesting that up to 90% of adolescents engage in gaming for nearly 100 minutes per day.[13]

68. As the sophistication of gaming devices and game delivery methods has increased, so too has the sophistication of the design of games themselves.

69. Unlike their predecessors, many modern-day games are enormous in scale, providing countless hours of non-repetitive, unique gameplay that allows players to become immersed in the world of the game.

70. The ways in which game developers monetize their games have also changed over time. In the past, game developers earned revenue primarily through the one-time sale of their games. Although some game developers still follow this model, others – including Defendants – allow their games to be downloaded for no or minimal cost and generate revenue through purchases made within the game.

71. In-game purchases can include, but are not limited to, cosmetic customizations for the player's character (e.g., hats, uniforms, hair styles), "boosters" that help their character perform better or progress faster within the game, and "season passes" that allow players to access exclusive in-game content.

72. Many of these in-game purchases are relatively low cost, leading to them being termed "microtransactions."

---

[12] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

[13] Kylie Falcione & Rene Weber, *Psychopathology and Gaming Disorder in Adolescents*, 8 JAMA Network Open (July 29, 2025), available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2836903 (last visited Jan. 19, 2026).

73. In-game items available for purchase are often heavily advertised to players through means such as in-game pop-up advertisements during gameplay, loading screens while users wait for gameplay to start, and in-game stores.

74. Many games also offer game-branded products such as toys, energy drinks, apparel, bedding, home goods, board games, and more.

75. Game developers that offer their games at no or low cost, such as Roblox and Minecraft, rely on these microtransactions to turn a profit. Indeed, the design and marketing strategy associated with such games is rooted, in part, in the theory that the revenue from the on-going microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user.

76. Accordingly, modern gaming companies are enlisting PhD behavioral psychologists and using research to implement programming into their games that will addict players with a goal of increasing the amount of playtime, thereby prolonging their exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with microtransactions that generate profits for the game developer.

### C. OPERANT CONDITIONING SYSTEMS AVAILABLE IN MINECRAFT AND ROBLOX

77. Minecraft uses a core gameplay loop to encourage continuous play. This involves repeatable, moment-to-moment actions like mining resources, crafting tools, and building structures. The player's decisions and accomplishments in each cycle provide a satisfying, immediate reward.

78. Minecraft uses a secondary loop that includes long-term projects and goals built from the core gameplay loop to gather all game resources the play needs to create a false sense of a significant long-term achievement.

79. Minecraft rounds out the operant conditioning with a meta loop which creates the ambitious target of a player mastering the game or building a functional world. These ambitious targets ensure the players have a reason "why" they need to return to the game.

80. Roblox also uses a compelling core loop, a robust game progression system and a gaming community to reinforce coming back to the game.

81. The Roblox core loop uses behavior techniques of immediate fun engaging players within the first five minutes of gameplay. Then Optimal Pacing is used to ensure the game is balanced in difficulty to the skill of the player to avoid feelings of inadequacy or difficulty creating a desire to continue playing and a false sense of achievement. Immediate feedback is provided to trigger positive reinforcement of the desired behavior of increased gameplay. To keep the continued play going an element of randomness which includes random events, new challenges or loot-drop system is deployed to lure in gamers.

### 1.  Rewards Reinforce Negative Behavior - Continuous Video Game Play

82. In the context of gaming Products, rewards act as positive reinforcement, encouraging gamers to keep playing. Consider the satisfaction of leveling up, finding a rare item, or achieving a high score. Each of these milestones provides a reward, which triggers a dopamine release in the brain—the internal "feel-good" chemical. This surge of dopamine reinforces the behavior, making it more likely that a gamer will come back to the game in search of that same pleasure.[14]

83. The research of American psychologist and behavioralist B.F. Skinner on reinforcement also emphasized the power of variable rewards—rewards that come at unpredictable times or

---

[14] Skinner, B. F. (1938). *The behavior of organisms: an experimental analysis.* Appleton-Century.

intervals. In his famous experiments with pigeons, Skinner found that animals were more motivated to perform a task when they were rewarded on a variable schedule rather than at regular intervals. This concept translates well to games, where rewards are often distributed unpredictably. Think of loot drops in adventure games or rare cards in a deck-building game. The uncertainty of when and what reward will be given keeps players engaged, eager to discover what's next.

84. All Defendants built operant conditioning into their respective Video Game Products by positively reinforcing and rewarding continued video gameplay time and punishing users when they do not play or otherwise fail to conform to the desired behavior of increased play time and increased purchasing of microtransactions.

85. This implementation is not limited to games, however, as even Microsoft's Xbox system, on which games are played, implements operant conditioning to drive continuous play irrespective of any specific games or content using methods like streaks and trophies.

## 2. Game Flow Keeps Player Connected to the Operant Conditioning

86. When a game's difficulty level is balanced just right—not too easy, but not too hard—it can lead to what psychologist Mihaly Csikszentmihalyi calls the Flow State. This is a state of deep focus where the player is completely absorbed in the activity, often losing track of time.[15] Games use incremental challenges to create flow, gradually increasing difficulty to keep players in the zone, fully engaged but not overwhelmed. Achieving flow is inherently rewarding, encouraging repeat play as players seek to experience it again.

## 3. Social Identity in Gaming-Operant Conditioning

---

[15] Csikszentmihalyi, Mihaly. (1990). Flow: The Psychology of Optimal Experience.

87. Games don't just offer individual rewards; they often fulfill social needs as well. Research has shown that social interactions in games, such as cooperation, competition, and team-based activities, are strong motivators for repeat play. According to Social Identity Theory, people derive a sense of self and belonging from their group affiliations.[16] When players form teams, clans, or guilds, they start to see themselves as part of a community, which encourages loyalty and continued participation.

88. In a survey conducted by the Entertainment Software Association (ESA) in 2024, 73% of adult U.S. gamers agree that video games introduce people to new friends and relationships, while others noted that video games have allowed them to meet a good friend, spouse, or significant other. (ESA, 2024). Social games that involve interaction with friends or online communities make the experience richer and more satisfying, which reinforces the desire to keep playing.[17]

### 4.  Psychology of Progress - Operant Conditioning Tool

89. Games are known for their use of achievements, badges, and progress indicators—elements that symbolize advancement and status. These features draw on the Goal-Setting Theory, which posits that specific, challenging goals lead to higher performance and greater motivation (Locke & Latham, 1990).[18] When players see a clear path to progression, such as leveling up or earning achievements, they are motivated to reach those milestones, which enhances engagement and repeat play.[19]

---

[16] Tajfel, H., & Turner, J. C. (1979). An integrative theory of intergroup conflict. In W. G. Austin, & S. Worchel (Eds.), The social psychology of intergroup relations (pp. 33-37). Monterey, CA: Brooks/Cole.

[17] Entertainment Software Association, Video Games Remain Lifelong Source of Entertainment for 190.6 Million Americans, THEESA.COM (May 16, 2024), **https://www.theesa.com/video-games-remain-lifelong-source-of-entertainment-for-190-6-million-americans/.**

[18] Locke, Edwin & Latham, Gary. (1991). A Theory of Goal Setting & Task Performance. The Academy of Management Review. 16. 10.2307/258875.

[19] *Id.*

### 5. Badge Effect and Status

90. Badges, trophies, and leaderboards add an additional layer of motivation by appealing to players' desire for recognition and status. Psychologists refer to this as extrinsic motivation—the drive to earn rewards or recognition from external sources (Deci & Ryan, 1985).[20] This is particularly powerful in social games, where players can see each other's achievements, creating a sense of friendly competition. The desire to achieve status among peers often keeps players coming back, striving for new achievements and recognition.

### D. CONTINUOUS VIDEO GAME PLAY ORIGINATING FROM OPERANT CONDITIONING RESULTS IN VIDEO GAME ADDICTION

91. Operant conditioning is a behavior modification system serving as the architecture of video game design that many of today's video games utilize. The use of operant conditioning towards a gamer can be one of the factors contributing towards video game addiction; operant conditioning is the strategy while video game addiction can be the by product or operant conditioning.

92. Once engaged in the game, the player sets asides their rules for their daily life and accepts the rules of the game as the new way to live life.

### 1. AMOUNT OF TIME PLAYED CORRELATED TO SEQUALAE OF VIDEO GAME ADDICTION

93. Research has examined the relationship between game time and physiological effects. One study showed positive bioelectrical prefrontal activity during gaming tasks of healthy gamers between the ages of 8 and 12 who limited game play to 20 minutes.

94. In contrast, a similar study of unhealthy gamers with an IGD diagnosis showed a thinner cortex in the brain with a smaller volume of gray matter. The reward-related network and the

---

[20] Deci, E. L., & Ryan, R. M. (1985). Intrinsic Motivation and Self-Determination in Human Behavior. New York, NY: Plenum.https://doi.org/10.1007/978-1-4899-2271-7

gamers inhibition system was altered, the orbitofrontal cortex and anterior cingulate cerebral area were overstimulated, similar to a drug addiction.

95. Recently, Kwak et al. longitudinally compared 14 adolescents with IGD to 12 professional internet gaming students who practiced for about ten hours a day, within a defined support system that included practice, physical exercise, lectures on team strategy, rest and mealtimes. After one year, both groups showed increased brain activity within the attention system of the parietal lobe. However, professional gamers improved problematic behaviors, impulsivity, aggression, depression and anxiety, while adolescents with internet gaming disorder showed no behavioral improvement and dysfunctional brain activity within the impulse control network in the left orbitofrontal cortex.

### 2. ATTENTION DEFICIT DISORDERS EXACERBATED WITH VIDEO GAME ADDICTION

96. A three-year longitudinal study by research scientist Dr. Doug Gentile demonstrated that the more time a child spends playing video games the more problems they have with attention span.  In fact, children with attention span problems such as ADHD, are more attracted to video games and find those kids neglect activities that would have otherwise demanded their control and attention such as homework, sports and household chores.

97. The sequalae of video game addiction causes anxiety, impulsivity, low self-esteem, poor school performance, emotional and social intelligence deterioration, social isolation, cognitive decline, exacerbation of ADHD, visual problems, seizures, orthopedic injuries, depression, addiction, orthopedic injuries from overuse injuries of controllers, suicide attempts and suicide.

98. The increase in the rate of suicide, of youth in particular, is occurring amid an increase in the percentage of youth playing video games. In 2017, 43% of U.S. students played video or

22

computer games for 3 hours or more daily, an increase of 22% to 43% from 2003 to 2017 (CDC, 2018a). In addition, 15% of U.S. high school students were obese and 16% were overweight in 2017, an increase from 1999-2017 of 11% to 15% for obesity and 14% to 16% for overweight youth (CDC, 2019b).

### E. OPERANT CONDITIONING AS A TOOL TO DRIVE PROFIT

99. The goal of video game addiction by Defendants is not healthy gaming; it is and always has been continuous video game play for profit.

100. The monetization of modern video games through microtransactions incentivizes companies to prolong play time as much as possible because the longer the play time, the more revenue can be generated through in-game purchases and microtransactions.

101. Defendants did not implement adequate measures to allow parents and teachers to monitor and control video game play time. Such measures would have a chilling effect on excessive play time.

102. Parental controls are non-existent or defective in the most frequently played products like Minecraft and Roblox. Implementing appropriate parental controls and safety systems would be sufficiently narrowly tailored to protect minors from the harmful effects of unauthorized behavior modification through operant conditioning, continuous play, the establishment of disordered behavior while still a minor, and other harms associated with Defendants' Products without restricting adults from accessing Defendants' Products.

103. Instead, each Defendant is accountable for failing to warn that operant conditioning is being used in Defendants' respective Video Game Products for the goal of continuous video game play. Additionally, Defendants failed to include available safeguards, such as accurate time tracking in cross platform, game sharing and educational versions of Defendants' Video Game Products, as well as defective and/or non-existent parental controls.

104.   Defendants' suppression of the diagnosis and treatment of video game addiction coupled with the failure to warn that continued video game play carried a risk of video game addiction and the sequalae flowing from the addiction demonstrates a reckless disregard for the safety and well-being of individuals such as Plaintiff.

105.   Furthermore, Defendants are aware that science has shown that prolonged use of video games by minors can result in lack of full development of the prefrontal cortex, cognitive decline, and inability to reach full educational potential.[21]

106.   IGD comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed with ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

107.   Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market Roblox and Mincraft as "educational" despite being fully aware of these risks, Defendants marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

**F.  EXCESSIVE VIDEO GAME PLAY AND EFFECTS ON ADOLESCENT BRAINS**

108.   For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of IGD.

109.   One of the ways that the impact of video game usage is studied is research about the role dopamine plays in the brain during gameplay.

---

[21] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder,* 75 Neurosci.Biobehav. Rev. 314 (Apr. 2017)

24

110.   Video games can and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by substance abuse or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing. Increased frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

111.   Video game addiction has been suggested to be as addictive as heroin.[22] In minors, the creation of this level of dopamine high at such a young age is difficult to overcome.

112.   The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the video games more and more, first at an increasing rate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

113.   This dopaminergic response triggers impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inability to control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to

---

[22] https://abc13.com/post/fortnite-can-be-as-addictive-as-heroin-health-experts-say-/4410795/

cognitive processes, attention disorders, severe depression, morbid obesity, mal and/or undernutrition, risk of suicide, risk of harming others and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers.[23]

114.    Additional research on the impact of video games reports physical changes to the brain and brain matter as a result of gameplay.

115.    Research has shown that prolonged use of video games affects the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control.  The "Operant Conditioning" utilized in video games reward impulsivity, which causes a lack of development in the prefrontal cortex. Instead, the regions of the brain that create impulsivity are overutilized and fed while executive function is starved leading to a lack of brain development in the prefrontal cortex. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

116.    Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, ability to adapt, withdrawal, conflict, and recurrence symptoms.

---

[23] E. Suárez-Soto, A. Peris-de la Hoz, A. Sanchez-Fernandez-Quejo, E. Rodriguez-Toscano, N. Lagunas, B. Reneses, A. De la Torre-Luque, Problematic gaming use and psychological distress among Spanish young adults: A comprehensive study, The European Journal of Psychiatry, Volume 39, Issue 1,2025,100279, ISSN 0213-6163,https://doi.org/10.1016/j.ejpsy.2024.100279.

117.  Empirical studies indicate that gaming disorders are associated with detrimental health-related outcomes.[24]

118.  Brain imaging studies have shown that excessive use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

119.  Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Gamers lack time awareness of how long they have played a game.[25]

120.  During adolescence, the prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the prefrontal cortex is arguably why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

121.  Brain imaging studies related to IGD have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that

---

[24] Pierpaolo Limone, Benedetta Ragni, Giusi Antonia Toto, The epidemiology and effects of video game addiction: A systematic review and meta-analysis, Acta Psychologica, Volume 241,2023,104047, ISSN 0001-6918, https://doi.org/10.1016/j.actpsy.2023.104047.
[25] Wood RT, Griffiths MD, Parke A. Experiences of time loss among videogame players: an empirical study. Cyberpsychol Behav. 2007 Feb;10(1):38-44. doi: 10.1089/cpb.2006.9994. PMID: 17305447.

transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies showed several regions of the brain demonstrated reduction in grey-matter volume in gaming disorder participants, as depicted here:



122. Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that engaging with video games activates regions of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

123. Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain because of prolonged use of video games. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are depicted in the following image:

---

[26] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).



[27]

124.   Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible because of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

125.   Research has shown that a neurodivergent minor with a diagnosis of Attention-Deficit Hyperactivity Disorder ("ADHD") or Autism Spectrum Disorder is at a higher risk of developing video game disorder or addiction, which can worsen one's ability to control impulsivity and result in brain damage.[28] Research has shown that while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming products, which typically develops swiftly in minors and neurodivergent individuals. This is particularly true when video games incorporate addictive and manipulative tactics, as well as other problematic psychological programing.

---

[27] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).
[28] Micah O. Mazurek & Christopher R. Engelhardt, *Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development*, 132 Am. Acad. of Ped. J.L. 2 (2013).

126. Defendants' operant conditioning behavior modification systems materially contribute to these harmful effects experienced by users, especially minor users, of each Defendants' Products.

### G. GAMING ADDICTION IS A RECOGNIZED AND DIAGNOSABLE CONDITION

127. Addiction to and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[29]

128. The diagnostic symptoms of IGD currently set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.

---

[29] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

129.   Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[30]

130.   As of 2022, "Gaming disorder"—disordered use of and/or play with video games—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[31]

131.   "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

## H. ADDICTIVE GAME DESIGN FEATURES CAUSE SIGNIFICANT HARM TO MINORS

132.   Due to the design and effects of Defendants' operant conditioning, coupled with the lack of adequate safeguards, these behavior modification systems employ content-agnostic mechanisms that adversely affect children regardless of the content of any particular game using the embedded architecture created by the Defendants. The harm is not neutral because these behavior modification systems work on humans on a fundamental level, but

---

[30] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).
[31] Other disorders found in that subcategory include alcoholism and gambling addiction.

unfortunately the degree of harm will vary, with children (particularly neurodivergent children) most vulnerable to the negative effects of operant conditioning and continuous game play.

133.   Video game developers, including Defendants, knew this, but nonetheless purposefully designed their products to exploit that vulnerable population to maximize profit, causing injury and detriment, including to students in Plaintiff's District and Plaintiff. Doing so has yielded the intended results: video game developers, including Defendants, have earned extraordinary financial revenue from this group of users as a result of placing their addictive Products that are targeted to minors into the stream of commerce.

134.   Each Defendant knew or was aware, or should have known and should have been aware, that their respective Video Game Products were dangerous and harmful to users, particularly minors, when used as intended and in a reasonably foreseeable manner. In fact, each Defendant intentionally caused and designed their respective Video Game Products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the Products. To that end, upon information and belief, each Defendant employed behavioral psychologists and/or neuroscientists to develop Products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the Products for longer periods of time.

135.   The microtransactions and other technologies, designs, features, mechanisms, algorithms, artificial systems, programs, and other processes each Defendant incorporated into their Products were implemented in a manner such that users (and, when users are minors, their caretakers) do not understand and have no way of understanding (or uncovering through reasonable diligence) that their use of the Video Game  Products involves engagement with

32

intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the Defendants.

136.  There is no meaningful disclosure of the addictive mechanisms and microtransactions in each Defendant's Products at the time they are purchased and/or downloaded to allow prospective users to make informed decisions as to whether using the Products are desirable, appropriate, safe, or worth the potential risk.

137.  At all times material hereto, each Defendant targeted consumers/purchasers, including minors, and specifically including Plaintiff herein, to use their respective Products and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

138.  Each Defendant, with knowledge of the vulnerable age of their users and without regard to other neurodivergent traits or social factors, targeted minors with manipulative programming to prolong use of their Products in hopes of inducing them to engage in microtransactions during their use of the Products. As a result of student use of each Defendant's Products, and because of the addictive design features incorporated into the Products, Plaintiff suffered harm including, but not limited to, expending, diverting, and increasing human and financial resources to: prevent video game use during school; hire counselors and other professionals to address video game addiction and its negative impact on youth; address consistent and pervasive disruption to the learning process caused by video game addiction in schools; address property damage on school and municipal property caused by video game addiction; hire additional government personnel, and address the overall youth mental health crisis caused by Defendants' conduct and products.

## I.  SPECIFIC OPERANT CONDITIONING METHODS USED BY DEFENDANTS

### 3. Minecraft

#### a. Mojang and Microsoft Design, Develop, and Market Minecraft

139. Minecraft was first developed and released by Mojang in November 2011.

140. In September 2014, Microsoft acquired Mojang and its intellectual property (including Minecraft).

141. After its acquisition of Mojang, Microsoft has been directly and actively involved with Mojang in the design, development, testing, production, manufacture, labeling, marketing, advertising, promotion, supply, sale, and distribution of Minecraft. Indeed, since acquiring Mojang, Microsoft has overseen over 125 updates to Minecraft.

142. To date, over 300 million copies of Minecraft have been sold,[32] and the game averages around 200 million players per month.[33]

#### b. Minecraft Targets Young Children to Increase Profits and Addict Younger Children

143. Minecraft is rated as safe for children 10 and older by the Entertainment Software Rating Board ("ESRB"), which is the leading game-rating system for games in the United States.

144. Nonetheless, Microsoft and Mojang know that much of Minecraft's player base is younger than 10.

145. Studies have shown that approximately 53% of children aged 6 to 8 and 68% of children aged 9 to 12 play Minecraft.[34]

---

[32] Britney Nguyen, Minecraft Just Surpassed 300 Million Sales–Here's The Only Video Game Still Beating It, Forbes (Oct. 16, 2023), https://www.forbes.com/sites/britneynguyen/2023/10/16/minecraft-just-surpassed-300-million-sales-heres-the-only-video-game-still-beating it/#:~:text=Minecraft%20has%20reached%20over%20300,Minecraft%20Live%202023%20this %20weekend.

[33] Spencer Whitworth, Minecraft Live Player Count (September 2024), Sportskeeda (Apr. 1, 2025), https://www.sportskeeda.com/minecraft/minecraft-live-player-count.

[34] Jane Mavoa & Marcus Carter, Minecraft Teaches Kids About Tech, But There's A Gender Imbalance At Play, The Conversation (Jan. 16, 2018), https://theconversation.com/minecraft-teaches-kids-about-tech-but-theres-a-gender-imbalance-at-play-89496.

146.   Despite Minecraft's age rating, Minecraft has engaged in numerous in-game virtual and physical product collaborations with child-friendly entities such as LEGO, Avengers, Mothers of the Galaxy, Spiderman, Moana, Star Wars, Sonic the Hedgehog, Super Smash Bros., The Incredibles, Angry Birds, Frozen, Ice Age, Sponge Bob Square Pants, Toy Story, Minions, Power Rangers, Fortnite, and more.[35]

147.   Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 10. Many young children watch Disney movies or play with LEGOs or Hot Wheels. Microsoft and Mojang explicitly and intentionally market Minecraft to young children by collaborating with the above entities.

148.   In addition to virtual collaborations, Microsoft and Mojang also have physical Minecraft merchandise they produce or sponsor, most of which are toys or children's items. For example, Microsoft and Mojang have created a kids educational touchscreen smart watch; an LED lamp that looks like a Minecraft torch; a glitter motion light; plush toys based on Minecraft characters; Minecraft themed LEGO sets, action figures, board games, and Hot Wheels; foam weapons; clothing; pajamas; and Halloween costumes. Minecraft also has a line of books for children as young as five that are intended to teach children how to read.

149.   Microsoft and Mojang organize their advertisement and collaboration strategies around the interests of young children and make a significant portion of their revenue from young children and their families.

   **c.  Minecraft Education**

150.   Microsoft has consistently promoted Minecraft not merely as an entertainment product, but as an educational tool that enhances students' learning across multiple subjects and builds key

---

[35] Category: Collaborations, Minecraft Wiki, https://minecraft.wiki/w/Category:Collaborations (last visited July 24, 2025).

twenty-first-century skills, going so far as to introduce a specific version marketed for schools called Minecraft Education.[36]

151.   Children are introduced to Minecraft School Edition at a young age which creates an "Operant Conditioning" lab[37] to assure school age children are taught to respond to game stimuli that create the desired response, such as continued play or purchasing more microtransactions.

152.   Defendants have had knowledge that IGD has been a consequence of continued video game play well over a decade.

153.   Upon information and belief, Minecraft Education was introduced into the school system with a fully drafted implementation program to assure schools would assist in unknowingly assuring children would become addicted to video games. The Trojan Horse of video game addiction began in schools—not in parent's homes—and was touted as "educational".

154.   There is no parental consent or ability to track the amount of video game play for time spent on Minecraft Education. Instead, children were first introduced to Minecraft from their school issued laptop without parental consent to use operant conditioning in an educational or video game setting.

155.   Video game sharing and cross platform play assured the real amount of video game play would always be elusive for a parent since both allow children such as to play games that are not trackable for parents.

---

[36] *See* Minecraft-Education-Edition-Parents-Guide-1.pd*f See also* *The power of game-based learning with Minecraft Education | Microsoft Education Blog*
[37] Irwin Helvey, Casey & Gates, Lucille & Rountree, Paige & Cariveau, Tom. (2023). Gamified human operant research: A brief introduction to Minecraft Education. 10.17605/OSF.IO/VT58F.

156.   IGD comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed as ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

157.   Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market Minecraft as "educational" despite being fully aware of these risks, Defendants marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting. On information and belief, Defendants have spent considerable time and money to suppress and fight the medical community, parents and school awareness of the video game addiction epidemic.

### d.  Microsoft and Mojang Deceptively Promise Safety and Educational Value in Minecraft

158.   Microsoft and Mojang do not adequately inform users of the inherent risks involved with using and playing Minecraft or that the Product was designed to make users play more to their potential harm.

159.   Instead, Minecraft's website provides users, potential users, parents, and educators with false assurances of safety. For example, Microsoft and Mojang state that:

   a. they "hold [them]selves accountable for making Minecraft as safe as possible for everyone."[38]
   b. it is "so important that [their] games are a safe and welcoming place for all players."[39]
   c. "player safety is a priority for Mojang to ensure everyone feels safe."[40]

---

[38] Minecraft Help Center – General Safety, Minecraft, https://help.minecraft.net/hc/en-us/articles/8047895358605 (last visited July 24, 2025).
[39] *Id.*
[40] Community Standards for Minecraft, Minecraft, https://www.minecraft.net/en-us/community-standards (last visited July 24, 2025).

      d. their "community standards help [them] build a community that is open and safe for everyone."[41]

160. Specifically, in public-facing materials, Microsoft expressly represents that Minecraft Education "offers a unique and immersive learning experience that can engage and inspire your child's curiosity, creativity, and critical thinking skills," and describes Minecraft Education as "a powerful teaching and learning tool that supports deep and meaningful student-led learning."[42]

161. Microsoft represents that Minecraft Education offers "hundreds of pre-made Minecraft worlds" and "a library of hundreds of lesson plans in Language Arts, Computer Science, Math, Art & Design and History," many with "supplementary Minecraft worlds, so students can apply their learning in-game."[43]

162. Microsoft tells educators and parents that Minecraft Education "is a powerful teaching and learning tool that supports deep and meaningful student-led learning" and provides examples of how "MCEDU can drive learning outcomes in subjects including Math, English Language Arts, Computer Science, as well as challenging topics to teach such as CyberSafety."[44]

163. In its Parent's Guide, Microsoft lists specific claimed educational benefits, stating that Minecraft Education "is safe, easy to use, and built for the classroom," and that it "can enhance your child's educational journey" by engaging them in subjects such as math, English language arts, computer science, and cybersafety.[45]

---

[41] Minecraft End(er)-User License Agreement ("EULA"), Minecraft, https://www.minecraft.net/en-us/eula (last visited Apr. 8, 2025).

[42] Minecraft-Education-Edition-Parents-Guide-1.pd*f See also  The power of game-based learning with Minecraft Education | Microsoft Education Blog*

[43] Minecraft-Education-Edition-Parents-Guide-1.pdf

[44] *Id*,.

[45] *Id*.

164.   Microsoft expressly encourages home use tied to school deployments, telling parents that "Your child may already have access to Minecraft Education through their school account and be learning in the classroom with MCEDU," and providing step by step instructions for using the same for "home learning."[46]

165.   Microsoft has also published family facing blog posts such as "What is Minecraft Education? An Intro for Families," explaining that Minecraft Education is designed to "bring learning to life," and directing families to "learn together at home with these Minecraft Education resources for parents" and "family friendly activities that can be tried at home."[47]

166.   Microsoft represents that Minecraft Education "supports deep and meaningful student-led learning," "builds confidence," and "keeps students engaged," and that it "drives learning outcomes in subjects including science, technology, engineering and mathematics (STEM), history and language arts."[48]

167.   In a Microsoft education blog post titled "The power of game-based learning with Minecraft Education," Microsoft claims that Minecraft Education "promotes critical thinking, teamwork, creativity, and problem-solving while helping students develop digital skills for their future," and that it "can also help motivate learning, improve attendance, and build student agency."[49]

168.   Microsoft has published a research summary titled "The Educational Benefits of Minecraft," which asserts that Minecraft "significantly enhances educational engagement across subjects, boosting skills like creativity, collaboration, critical thinking, and problem-solving," "supports literacy development in English Language Arts," and "serves as

---

[46] *Id.*
[47] *Id.* See also Information for Families | Minecraft Education
[48] *Id.*
[49] *Id.*

a practical tool for exploring complex [math and science] concepts, improving students' understanding and performance."[50]

169.   Through these explicit statements in guides, research summaries, blogs, and marketing materials, Microsoft has positioned Minecraft Education as a safe, standards aligned, research supported educational tool  that improves academic outcomes, builds critical skills, and is appropriate for widespread use by children in schools and at home.

170.   Minecraft, however, does not offer any parental controls for Minecraft Education or offline play of Minecraft.

171.   Minecraft does feature some parental controls for certain Xbox play, but they are grossly deficient. While minor accounts for children younger than 16 are automatically created with some restrictions on in-game communications and other features, there is no age verification process. If a minor who is under 16 wants to create a Minecraft account with a fictitious birth date, they can, and can then create an account and play Minecraft without the restrictions of an account where a user represents they are under 16.

172.   Microsoft and Mojang could, but choose not to, require express parental consent for minors under 16 to create an account. If a minor under 16 creates an account, they can still access almost all game content and purchase items. There is no daily spending limit automatically imposed on any minor accounts.

173.   Parents can access parental controls to change the automatic restrictions set by Microsoft and Mojang if their minor is under 16, however, such features are only available if a parent creates their own account and links it to the minor's account. To engage with/change any

---

[50] *Id.*

parental control settings, the parent must first know the account exists, and subsequently know the gamertag information to link their account to their minor's account.

174.  Microsoft and Mojang do not provide parental controls within Minecraft regarding screen time, gameplay, and/or usage. Microsoft and Mojang could, but choose not to, allow parents to set time limits on their Minecraft account. Microsoft and Mojang also could, but do not, allow any users to set self-imposed time limits on their Minecraft account.

175.  Lack of parental controls are by design to conceal the "operant conditioning" built into the video game as well as conceal the time spent playing Minecraft.

176.  At account setup, Minecraft's website contains no warnings labels, banners, or messaging informing minor, parents or schools that operant conditioning is being used to program the children to continuously play Minecraft. There is no warning of the sequalae of video game addiction and the attendant side effects of video game addiction stemming from excessive use of Microsoft and Mojang's Product. Users do not know their behavior is being manipulated through a system of rewards and punishments in the video game.

177.  Microsoft and Mojang do not disclose to the public or users of Minecraft any of the psychological tactics or addictive features they purposefully incorporate into their Product. Instead, Microsoft and Mojang tout their Minecraft game as educational and have developed Minecraft Education Edition for use in the classroom.

178.  Minecraft: Education Edition ("Minecraft Education") is a game-based learning product. Minecraft Education uses the Minecraft graphics with "features built specifically for learning

environments." It includes over "600 standards-aligned lessons,"[51] and includes coursework across various subjects.[52]

179.  Though Minecraft's age-rating is for children 10 and older, Minecraft Education has lesson plans for children as young as 5.[53] and encourages school leaders, educators, and parents to use Minecraft. Minecraft Education provides resources so educators can "learn to teach with Minecraft."[54]



180.

181.  Accordingly, the use of Minecraft Education introduces children to the game that are years younger than Minecraft's age rating.

**e.  Minecraft was Designed with Intentionally Addictive Features**

182.  Upon information and belief, Microsoft and Mojang actively employ or have employed psychologists, behavioral experts and actual minor gamers to work on Minecraft development.

---

[51] What is Minecraft Education?, Minecraft Education, https://education.minecraft.net/en-us/discover/what-is-minecraft (last visited July 24, 2025).

[52] Minecraft Education For Educators: Get Started, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited July 24, 2025).

[53] Minecraft's own website states "[s]oon students from kindergarten to graduation can utilize Minecraft Education." Back to School Preview: Make it Minecraft!, Minecraft Education (Apr. 8, 2025), https://education.minecraft.net/en-us/blog/back-school-preview-make-it-minecraft

[54] Minecraft Education For Educators: Get Started, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited Apr. 8, 2025).

183.   One example of an intentionally addictive feature within Minecraft is a specific in-game reward system known as "advancements" or "achievements" created by Microsoft and Mojang in order to incentivize players to engage in repeated and prolonged sessions playing Minecraft.

184.   In Minecraft Java, when a user completes a specific action or "advancement," they receive a number of "Experience Orbs" or "EXP" or "XP", which are used like a currency to enhance user's in-game equipment and reach new levels of the game. XP is gained by performing specific tasks, like successfully defending a village from a raid or killing a hostile monster:[55]



185.   When a user obtains enough XP, they can "level up," meaning the user's character advances to a higher level, becomes more powerful, and gains access to new talents and equipment.[56]

186.   In Minecraft Bedrock, when a user completes a specific action or task, they receive an achievement or trophy. The achievement is then logged in the player's Minecraft account. Most achievements provide in-game rewards such as creator items or emotes when unlocked.

187.   Not all advancements and achievements are equally easy to obtain. Instead, Microsoft and Mojang have intentionally created advancements and achievements that incentivize many hours and/or days of gameplay. By way of example, Microsoft and Mojang chose to reward

---

[55] Advancement, Minecraft Wiki, https://minecraft.fandom.com/wiki/Advancement (last visited July 24, 2025).
[56] How to Earn Experience Points & Level Up in Minecraft, (Jan. 24, 2022), https://www.dummies.com/article/home-auto-hobbies/games/online-games/minecraft/how-to-earn-experience-points-and-level-up-210066/.

players for playing Minecraft for 100 days, playing underwater for 10 minutes, building maps from pieces hidden throughout the game, trading 1,000 emeralds, collecting a surplus of resources, and more. These achievements can take countless hours across many days to unlock due to the complexity and/or time-consuming nature of the steps needed to unlock the achievement.

188.   This reward system creates addictive engagement and encourages players to continue gameplay.

189.   Microsoft and Mojang knew that its Minecraft Product contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms Microsoft and Mojang marketed and misrepresented Minecraft as "educational" and safe for use by minors.

190.   The use of operant conditioning, a lack of warnings about the harms of use, no option for self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Microsoft and Mojang designing Minecraft with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft and Mojang's knowledge that abuse and compulsive use of its Product by foreseeable users, i.e., minors and neurodivergent individuals, can and did lead to users, including Plaintiff, suffering from addiction, withdrawal symptoms, negative consequences on cognitive processes.

191.   Microsoft and Mojang marketed and misrepresented Minecraft as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

192.   Minecraft's behavior modification systems include a core gameplay loop to encourage continuous play. This involves repeatable, moment-to-moment actions like mining resources, crafting tools, and building structures. The player's decisions and accomplishments in each cycle provide a satisfying, immediate reward.

193.   Minecraft 's behavior modification systems also use a secondary loop that includes long-term projects and goals built from the core gameplay loop to gather all game resources the play needs to create a false sense of a significant long-term achievement.

194.   Minecraft rounds out the operant conditioning with a meta loop which creates the ambitious target of a player mastering the game or building a functional world. These ambitious targets ensure the players have a reason "why" they need to return.

### 4.  XBOX PRODUCTS

195.   Similarly, Xbox products are designed and operated using core behavioral principles of operant conditioning to drive repeated use, including among children and adolescents.

196.   Through features such as progression systems, achievements, randomized rewards, and continuous social feedback, Xbox products deploy reinforcement schedules that reward players unpredictably and intermittently, creating powerful incentives to continue playing to return frequently to the platform. These mechanisms mirror the classic "variable-ratio" and "variable-interval" schedules identified in behavioral psychology as especially effective at producing persistent, hard-to-extinguish patterns of behavior.

197.   Xbox achievements, badges and "Gamerscore" systems provide ongoing conditioned rewards for discrete behaviors—logging in, playing "just one more match," or engaging with particular titles—while dynamic notifications, streaks, and time-limited events operate as prompts and cues that trigger renewed engagement.

45

198.   Microsoft's Xbox achievement systems applies to all games played through the Xbox systems drives continuous engagement with the Xbox system itself rather than any particular game using public points, achievement badges, and social recognition rewards at variable intervals across all games in the Xbox ecosystem.

199.   For young users, whose self-regulation and impulse control are still developing, these layered reinforcement systems predictably increase play frequency and duration and make disengagement more difficult, all in service of maximizing time on platform and in-game spending rather than safeguarding child well-being.

### 5. ROBLOX CORP.

#### a. Roblox Gameplay Basics

200.   Roblox is a video game that was developed and published by Roblox Corp. The game was released in September 2006.

201.   At present, Roblox has approximately 111.8 million daily active users.[57]

202.   More than 45% of the consumers playing Roblox are under age 13.[58]

203.   Roblox is available to play on gaming consoles, computers, tablets, and cellular devices.

204.   Roblox is an online game that is free to download and play, making it easily accessible to all users, including minors.

205.   Individuals that wish to play Roblox must create a Roblox account.

206.   In order to create a Roblox account, individuals must include a birth date, username, and password.

---

[57] Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 29, 2025).
[58] The Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 29, 2025).

207. Users of any age can create a Roblox account, though users cannot enter a birth date for any year after 2020. Roblox Corp. does not require users to verify their age when creating a Roblox account. Accordingly, users can represent that they are younger or older than their actual age.

208. Users are also not required to obtain parental consent to create a Roblox account nor to play Roblox.

209. Robux can be obtained by (a) purchasing it with real currency; (b) receiving recurring stipend given to users with a Roblox Premium membership; and (c) earning it from selling "game passes" or "developer Products" to other Roblox platers.

210. Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

211. Roblox has hosted over 3.7 billion virtual transactions on its platform.

212. Roblox Corp. admits in public filed documents that it has the ability to "dynamically apply relevant content filters, anti-addiction rules, payment limits, parental; consent requirements., and certain other regional requirements."[59]

213. For example, the games available to any particular user will vary based upon the age they entered when generating their account and what games Roblox's algorithm recommends to the users, and games can be restricted using ID verification requirements.

214. In November of 2024, Roblox Corp. announced, "major updates to [its] safety systems and parental controls." It claimed these updates were implemented because "safety is and always has been foundational to everything [it does] at Roblox.

---

[59] *Earning on Roblox*, Roblox Creator Hub, https://brands.roblox.com/resources/activating-on-roblox-the-virtual-economy (last visited Sept. 29, 2025).

215.   The changs Roblox Corp. made in 2024 included changes to viewable content for each age group, parental controls for minor's screen time usage, and a new minimum age at sign up.

216.   April of 2024, Roblox Corp. implemented further updates to parental controls., stating that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users." These 2025 updates included the ability for guardians to view their minor's top Roblox games the minor has played and how long the minor spent in each game for the past week. Guardian can now also block specific games and experiences for their minors.

217.   Until 2024, Roblox Corp. did not provide parental controls for minor's screen time and usage in Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account for over eighteen years of operation.

218.   Until approximately September 2024, Roblox Corp. allowed users to represent their age as young as one year old and have access to virtually all content on the platform. Even now, parents whose minors are over the age of 12 cannot set restrictions on spending limits, set time limits, change privacy settings, or manage friends and communication on their minor's account. Roblox Corp.'s changes to parental controls in 2025 did not address these failures to protect and limit minor users.

219.   Until 2025, Roblox Corp. did not provide guardians with the ability to block specific games and experiences, nor for guardians to view how much time their minor spends in each respective game.

220.   The implementation of these restrictions and changes by Roblox Corp. in 2024 and again in 2025 demonstrates its understanding of its responsibility to implement such restrictions and safety measures, and further, demonstrates how easily Roblox Corp. can implement

48

restrictions and safety measures in general. The changes that Roblox Corp. implemented in 2024 and 2025 did not require game by game review by Roblox. Corp., but instead were implemented as system-wide updates.

221.   Despite its ability to implement anti-addiction rules, specific parental controls, payment limits, and restrictions, upon information and belief, Roblox Corp. instead chooses not to implement those restrictions in order to increase its profit.[60]

**b. Roblox is Marketed to Minors Yet Lacks Adequate Safety Features**

222.   Roblox Corp. does not inform users that operant conditioning was used to elicit the targeted behavior or continued video game play which posed a risk IGD and the injuries that correspond to IGD.

223.   Instead, Roblox Corp. provides users, potential users, and guardians false assurances of safety.[61] For example, Roblox Corp. states that:

   a.   it has "built a platform with safety at the foundation;[62]
   b.   it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission;[63]
   c.   users should "learn about how Roblox's commitment to safety and civility helps students grow;[64]
   d.   it "strive[s] to make [its] systems as safe as possible by default, especially for [its] youngest users;[65]

---

[60] See Roblox Corporation, Form 10-Q (May 1, 2025), p. 68 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509825000118/rblx-20250331.htm ("...[R]equirements for verified parental consent before allowing children to create an account may limit the use of our Platform or reduce our overall demand for our Platform, which would harm our business, financial conditions, and results of operations").
[61] Matt Kaufman, CFO, Driving Civility and Safety for All Users, https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited Sept. 29, 2025).
[62] Id.
[63] Id.
[64] Education, Roblox, https://education.roblox.com/ (last visited Sept. 29, 2025).
[65] Naren Koneru, Eleonore Vonck, Open Sourcing Roblox Sentinel: Our Approach to Preemptive Risk Detection (Aug. 7, 2025), https://corp.roblox.com/newsroom/2025/08/open-sourcing-roblox-sentinel-preemptive-risk-detection.

e.  its age recommendations for its Product are "grounded in child development research and informed by industry standards, essentially confirming its reliance on scientific research about adolescent development and content consumption;[66]

f.  its recommendations are created by "examin[ing] global industry standards and consult[ing] child development experts;[67]; and

g.  its Product is part of the "[n]ew era of teaching and learning," and teaches educators how to "pilot Roblox in [their] class or school district," assuring parents, educators, and students that its Product is safe for use of all ages.[68]

224.  While Roblox does feature some parental controls in its Product, almost all of these parental controls can only be applied to minors' accounts if the minor is under 13, despite Roblox Corp.'s alleged desire to create one of the safest online environments.

225.  Roblox Corp. states on its website that: [69]

> ▼ First, get the go-ahead
>
> If you're under 13 years old, please get permission from your parent or guardian to use Roblox. You shouldn't use our Services without their go-ahead.

226.  Roblox Corp. could, but does not, allow any users to set self-imposed time limits on their Roblox account.

### c.  Roblox Corp.'s Monetization of Intentionally Addictive Game Design

227.  Roblox Corp. designed the game-creation aspect of its Product to allow users to create their own Roblox video games for play and purchase by other Roblox users, including minors. Though third parties create the games, Roblox Corp. profits from all monetary transactions that occur within these third-party created games.

---

[66] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/31247519953172-Experience-Controls (last visited Sept. 29, 2025).

[67] Content Maturity Labels, Roblox, https://en.help.roblox.com/hc/en-us/articles/8862768451604-Content-Maturity-Labels (last visited Sept. 29, 2025).

[68] Education, Roblox, https://education.roblox.com/ (last visited Sept. 29, 2025).

[69] Roblox Privacy and Cookie Policy, Roblox, https://en.help.roblox.com/hc/en-us/articles/115004630823-Roblox-Privacy-and-Cookie-Policy (last visited Sept. 29, 2025).

228.  Roblox Corp. constructed a "Creator Hub" on its website. The Creator Hub provides users with instructions (including "how-to" videos) from Roblox Corp. on how users can create their own Roblox games and also provides users with tools that enable or facilitate creation of their own Roblox games.

229.  Users that create their own games are referred to as "Creators" or "Developers." Upon information and belief, some the creators or developers include child psychologist and/or were designed with the assistance of child psychologists.

230.  Roblox Corp.'s website boasts that its top ten Developers made, on average, $33.9 million in 2024.[70]

231.  Roblox Corp. reports its Developers have been collectively paid $3.3 billion since 2018.[71]

232.  Beyond working with Developer to create additive games, Roblox Corp. purposefully designed other features within its Product to intentionally addict users.

233.  Roblox Corp. designed an achievement system within Roblox that rewards users for completing various tasks or actions. These achievements are not based upon a user's time or actions within a third-party game "experience," but rather the user's time and actions on Roblox itself. For example, a user playing Roblox can unlock an achievement for playing Roblox for three days in a row, ten days in a row, and twenty days in a row. Likewise, users can earn an achievement for playing Roblox for an hour. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. This system is designed to keep users engaged with the game, incentivize long periods of gaming repeated across multiple days, and ultimately increase Roblox Corp.'s profits.

---

[70] https://corp.roblox.com/newsroom/2025/09/roblox-annual-economic-impact-report
[71] https://create.roblox.com/docs/production/earn-on-roblox

234.   Roblox Corp. knows its Product incorporates addictive designs that pose risks of causing users to develop dangerous and disordered use and overuse of the Product. In fact, Roblox Corp. developed addictive strategies, game designs, and monetization schemes, implemented them on Roblox itself and then instructed those developing "experiences" for its platform to incorporate those addictive features into their games that would be offered to minors.

235.   Upon information and belief, Roblox Corp. designed Roblox and the addictive strategies, game designs, and monetization schemes offered in its game and game design studio in conjunction with psychologists, neuroscientists, and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

236.   Roblox Corp. admits to consulting child development experts for aspects of game development:[72] Roblox Corp. actively employs or has employed psychologists and behavioral experts within its People Science and Analytics department and User Experiences department.[73]

237.   The use of operant conditioning, the use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Roblox Corp. employing harmful psychological tactics to take advantage of the chemical reward system of a user's brain  (especially a minor or neurodivergent person) to create addictive engagement, despite Roblox Corp.'s knowledge

---

[72] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/8863284850196-Allowed-Experiences-Controls (last visited Sept. 29, 2025).
[73] See, e.g., Erica Snow, LINKEDIN, https://www.linkedin.com/in/erica-snow-phd-75272b39 (last visited Sept. 29, 2025); Philip Simmons, LINKEDIN, https://www.linkedin.com/in/philippsimmons (last visited Sept. 29, 2025); Carissa Kang, LINKEDIN, https://www.linkedin.com/in/carissakang (last visited Sept. 29, 2025).

that abuse and compulsive use of its Product by foreseeable users, i.e., minors and neurodivergent individuals, can and did lead to users, including Plaintiff, suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Roblox Corp. marketed and misrepresented Roblox as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

238.   Roblox's behavior modification systems also use a compelling core loop, a robust game progression system and a gaming community to reinforce coming back to the game.

239.   The Roblox core loop uses behavior techniques of "immediate fun," engaging players within the first five minutes of gameplay. Then Optimal Pacing is used to ensure the game is balanced in difficulty to the skill of the player to avoid feelings of inadequacy or difficulty creating a desire to continue playing and a false sense of achievement. Immediate feedback is provided to trigger positive reinforcement of the desired behavior of increased gameplay. To keep the continued play going an element of randomness which includes random events, new challenges or loot-drop system is deployed to lure in gamers.

## J.   FACTUAL ALLEGATIONS OF FRAUDULENT CONCEALMENT

240.   As alleged above, Defendants actively promoted their products to educators, school systems, and parents as a safe, standard-aligned, research-supported educational platform that improves student engagement, attendance, and academic outcomes.[74]

241.   Defendants were, or in the exercise of reasonable care should have been, aware of the addictive potential and gambling-like nature of these mechanics and that their products contribute to and cause, among other things, impaired control, excessive use, and educational

---

[74] Minecraft Educational Benefits Whitepaper.pdf *see also* *Minecraft_Education_Parent_Resource_Guide.pdf* *See also* *Education | Roblox*

impairment in users, as reflected in the APA's published criteria and the growing literature on gaming disorder.

242.   Nonetheless, Defendants in marketing their products to school districts like Plaintiff, failed to disclose (a) that their core design borrows from operant conditioning techniques used in commercial games to maximize engagement, and (b) that immersion in such systems carries a risk of promoting problematic or addictive use among susceptible children.

243.   Defendants omission of these risks was material to school districts like Plaintiff, which relied on Defendants' affirmative educational and safety representations in elective to adopt, integrate into curriculum, and/or authorize, encourage, or permit student use of Defendants' products during and outside of school.

244.   Because information about gaming disorder and operant-conditioning-based engagement mechanics resides largely with Defendants' operators and game designers—and is not commonly understood by lay educators or administrators— Defendants' failure to disclose these dangers prevented Plaintiff and similarly situated districts from appreciating the full risk profile of the product and from taking reasonable steps to limit exposure.

245.   Because Defendants controlled the design of their respective video game products and had superior access to internal data on usage patterns, time on task, spending behaviors, and user complaints, while school districts lacked such information and reasonably relied on the companies' public representations, Defendants owed Plaintiff a duty to disclose material facts regarding addiction and conditioning risks that were known to them but not to Plaintiff.

246.  By promoting their products to school systems as safe educational tools while concealing known or foreseeable dangers of video game addiction and operant conditioning based engagement mechanics, Defendants fraudulently concealed material risks from Plaintiff and

similarly situated districts, thereby tolling any applicable statutes of limitations and giving rise to liability under federal and state law.

### K.  DEFENDANTS CONDUCT HAS HARMED SCHOOL DISTRICTS.

247.  Video game addiction can lead to a number of serious consequences. Gamers can forget that they need to sleep and eat, or even how to communicate with people in the real world. Gamers may play for 10, 15, or even 20 hours in a single gaming session. "Just a few more minutes" can turn into hours as the gamer progresses to the next challenge. They may also endure various medical issues resulting from back strain, eye strain, and carpel tunnel syndrome.[75]

248.  Academic performance is another factor that has shown a significant relationship with problematic video game use. Students who face difficulties in academics may use video games as a form of escape, which in turn exacerbates their academic performance. Recent research has highlighted that excessive video game use is associated with a decline in academic achievement.[76]

249.  "Learning engagement" has been generally described as "an active, fulfilling mental state associated with learning." Among the diagnostic criteria for evaluating gaming disorder are the abandonment of other activities, the loss of interest in other previous hobbies, and the loss or potential loss of work and social interaction because of gaming. A growing number of studies have detailed the adverse effects of excessive Internet usage on students' cognitive ability and learning broadly and on students' learning motivation and academic commitment specifically --- all to the detriment of their learning engagement and corresponding academic

---

[75] Mohammad, supra note 40.

[76] Garrido, supra note 57.

achievement. Stated succinctly, "the higher the level of addiction, the lower the learning engagement."[77]

250.   The widespread and compulsive use of Defendants' Products has consequences that stretch beyond the harm to the minors using the Products. It has fundamentally changed the learning and teaching environment at Plaintiffs' schools, affecting students, parents, teachers, administrators, coaches, counselors, and other members of Plaintiffs' communities.

251.   School districts have been, and continue to be, uniquely harmed by students' compulsive use of, and addiction to, video games. Students' compulsive, problematic use of Defendants' Products results in significant disruption to schools' operations, greatly frustrates their ability to achieve their mandate of educating students in a safe and healthy environment, and forces school districts to expend or divert significant resources in response.

252.   Addressing the wide range of impacts from students' video game addiction requires a multi-faceted approach that far exceeds school districts' available resources. School districts are forced to divert human and financial resources to address social media-related student behavior or mental health issues, taking away resources from other important school district operations, including teaching.

253.   In that regard, staff and teachers cannot ignore students who are in crisis and need to support those students, even if the support comes at the expense of the educational goals and experience for the larger student body. School campuses are public spaces, and classes and activities are communal experiences. Increases in anxiety, depression, suicidal ideation, and

---

[77]  Rui-Qi Sun et al., *The effects of online gaming addiction on reduced academic achievement motivation among Chinese college students: the mediating role of learning engagement*, 14 Frontiers in Psychol. (July 12, 2023), available at https://www.frontiersin.org/journals/psychology/articles/10.3389/fpsyg.2023.1185353/full (last visited Jan. 16, 2026).

other mental health crises impact both the students suffering from these problems and the other students, teachers, and staff who need to interact with these students.

254.   To address this complex issue, school districts must provide significant support for students in crisis and also educate staff, parents, and the community about the dangers presented by the excessive use of Defendants' Products. Such education includes how to safeguard children from those dangers and how to support students and families impacted by video game addiction and problematic use, and video game addiction therefore diverts time away from the educational mission of school districts and from other valuable engagement time.

255.   A recent report by the American Federation of Teachers, a teachers union representing 1.7 million educators, "details how school districts across the country are experiencing significant burdens as they respond to tech's predatory and prevalent influence in the classroom. . . ."[78] In short, video game addiction has caused a dramatic disruption to education in our public schools, thereby diluting the schools' core mission of educating our children, through increased costs and expenses to address the effects of video game addiction.

256.   As stated, schools are one of the primary providers of mental health services for school-aged children.[79] Indeed, over 3.1 million children ages 12–17 received mental health services

---

[78] American Federation of Teachers, *New Report Calls Out Social Media Platforms for Undermining Schools, Increasing Costs, Driving Youth Mental Health Crisis* (July 20, 2023), available at https://www.aft.org/press-release/new-report-calls-out-social-media-platforms-underminingschools-increasing-costs (last visited Jan. 20, 2026).

[79] Substance Abuse and Mental Health Services Administration, *Key Substance Abuse and Mental Health Indicators in the United States: Results from the 2019 National Survey on Drug Use and Health* (Sept. 2020), available at https://www.samhsa.gov/data/sites/default/files/reports/rpt29393/2019NSDUHFFRPDFWHTML/2019NSDUHFFR090120.htm (last visited Jan. 19, 2026).

through an education setting in 2020, more than any other non-specialty mental health service setting.[80]

257.   Most schools offer mental health services to students. In the 2021–22 school year, 96% of public schools reported offering at least one type of mental health service to their students.[81] But 88% of public schools did not strongly agree that they could effectively provide mental health services to all students in need.[82] The most common barriers to providing effective mental health services in public schools are (1) insufficient number of mental health professionals; (2) inadequate access to licensed mental health professionals; and (3) inadequate funding.[83] Student opinions also reflect that schools are unable to provide adequate mental health services. Less than a quarter of students in grades 6–12 report accessing counseling or psychological services when they are upset, stressed, or having a problem.[84] And, of the students who access mental health services, only 41% of middle schoolers and 36% of high schoolers are satisfied with the services they receive.[85]

258.   In part, schools are struggling to provide adequate mental health services because of the increase in students seeking these services. More than two-thirds of public schools reported an increase in the percent of students seeking mental health services from school since the

---

[80]  Substance Abuse and Mental Health Services Administration ("SAMHSA"), supra note 103.

[81]  Press Release, National Center for Education Statistics, *Roughly Half of Public Schools Report That They Can Effectively Provide Mental Health Services to All Students in Need* (May 31, 2022), available at https://www.prnewswire.com/news-releases/roughly-half-of-public-schools-report-that-they-can-effectively-provide-mental-health-services-to-all-students-in-need-301558015.html (last visited Jan. 20, 2026).

[82]  National Center for Education Statistics ("Nat'l Ctr. Educ. Stat."), supra note 105.

[83]  Nat'l Ctr. Educ. Stat., supra note 105.

[84]  YouthTruth, *Insights From the Student Experience, Part I: Emotional and Mental Health* (Fall 2022), available at https://youthtruth.org/wp-content/uploads/2024/05/YouthTruth_EMH.pdf (last visited Jan. 20, 2026).

[85]  YouthTruth, supra note 108.

start of the COVID-19 pandemic.[86] During this same period, adolescents increased their video game use significantly.[87]

259.   Thus, the increase in adolescent video game use during the pandemic has caused an increase in adolescents experiencing mental health problems. That relationship is reflected in reports from public schools. Over 75% of public schools reported an increase in staff expressing concerns about student depression, anxiety, and other disturbances since the start of the pandemic.[88] Students receiving mental health services in educational settings predominately do so because they "[f]elt depressed," "[t]hought about killing [themselves] or tried to" or "[f]elt very afraid and tense."[89]

260.   Anxiety disorders are also up, affecting 31.9% of adolescents between 13 and 18 years old.[90] "Research shows that untreated teenagers with anxiety disorders are at higher risk to perform poorly in school, miss out on important social experiences, and engage in substance abuse."[91]

261.   According to the National Alliance on Mental Illness, "[s]tudents ages 6–17 with mental, emotional or behavioral concerns are more than 2x times as likely to repeat a grade," and

---

[86]  Nat'l Ctr. Educ. Stat., supra note 105.
[87]  Tae sun Han et al., *A systematic review of the impact of COVID-19 on the game addiction of children and adolescents*, 13 Frontiers in Psychiatry (Aug. 17, 2022), at
https://www.frontiersin.org/journals/psychiatry/articles/10.3389/fpsyt.2022.976601/full (last visited Jan. 27, 2026).
Cf. Laura Marciano et al., *Digital Media Use and Adolescents' Mental Health During the Covid-19 Pandemic: A Systematic Review and Meta-Analysis*, Frontiers Pub. Health (Feb. 1, 2022), at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8848548/ (last visited Jan. 20, 2026).
[88]  Nat'l Ctr. Educ. Stat., supra note 105.
[89]  Rachel N. Lipari et al., *Adolescent Mental Health Service Use and Reasons for Using Services in Specialty, Educational, and General Medical Settings*, The Ctr. For Behav. Health  Stat. & Quality, SAMHSA (May 5, 2016), at https://www.samhsa.gov/data/sites/default/files/report_1973/ShortReport-1973.html (last visited Jan. 20, 2026).

[90]  Anxiety & Depression Ass'n Am., Anxiety Disorders – Facts & Statistics, at https://adaa.org/understanding-anxiety/facts-statistics (last visited Jan. 20, 2026).
[91]  Anxiety & Depression Ass'n Am., supra note 114.

"[h]igh school students with recent symptoms of depression are more than 2x as likely to drop out compared to their peers."[92]

262.   Specifically, 2023 data presented by the Health Policy Institute of Ohio (HPIO), about 20% of Ohio middle school students and 33% of high school students reported their mental health was "not good" most or all of the time, with rates increasing at higher grades.[93]

263.   As a result, the state and its partners are treating student mental health as a central determinant of school climate, safety, absenteeism, and learning,[94]

264.   Schools are struggling not only to provide students with mental health services but also to deliver an adequate education because of the youth mental health crisis. Students in grades 6–12 identify depression, stress, and anxiety as the most prevalent obstacles to learning.[95] These negative mental health outcomes are also the most common symptoms of excessive video game use. Most middle school and high school students also fail to get enough sleep on school nights, which contributes to poor academic performance.[96] Excessive video game use is linked to reduced sleep time and quality,[97] and it also contributes to poor academic

---

[92]   Nat'l Alliance on Mental Illness, *Mental Health By the Numbers* (updated 2025), available at https://www.nami.org/mental-health-by-the-numbers/ (last visited Jan. 20, 2026) (citing Data Res. Ctr. Child & Adolescent Health, Child and Adolescent Health Measurement Initiative, *2023 National Survey of Children's Health*, at https://www.childhealthdata.org/browse/survey/results?q=11602&r=1&g=1216 [last visited Jan. 20, 2026] and Véronique Dupèrè et al., *Revisiting the Link Between Depression Symptoms and High School Dropout: Timing of Exposure Matters*, 62 J. Adolescent Health (Feb. 2018), at https://www.jahonline.org/article/S1054-139X(17)30491-3/fulltext [last visited Jan. 20, 2026]).

[93]   See PowerPoint Presentation 2025 Health Policy Institute of OHio

[94]   Microsoft PowerPoint - What You Need to Know - OHYES! Facts for Fall 2025.pptx

[95]   YouthTruth, supra note 108.

[96]   Anne G. Wheaton et al., *Short Sleep Duration Among Middle School and High School Students - United States, 2015*, 67(3) Morbidity & Mortality Wkly. Rpt. 85–90 (Jan. 26, 2018), at http://dx.doi.org/10.15585/mmwr.mm6703a1 (last visited Jan. 20, 2026).

[97]   Ajay M. Bhandarkar et al., *Impact of social media on the academic performance of undergraduate medical students*, 77 (Suppl. 1) Med. J. Armed Forces India (Feb. 2, 2021), at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7873710/ (last visited Jan. 20, 2026) (citing Aryn C. Karpinski et al., *An exploration of social networking site use, multitasking, and academic performance among United States and European university students*, 29 (3) Comput. in Hum. Behav. (May 2013), at https://www.sciencedirect.com/science/article/abs/pii/S0747563212002798 [last visited Jan. 20,

performance by distracting students during class or study time and causing procrastination on school assignments. Accordingly, Defendants' conduct has also undermined students' rights to public education and undermined school districts' ability to provide students with a safe and high-quality public education.

265.   The youth mental health crisis has also caused a wide range of other behavioral issues among students that interfere with schools' ability to teach. In 2022, 60% of public schools saw an increase in classroom disruptions from student misconduct compared to school years before the pandemic.[98] In that same year, 58% of public schools also saw an increase in rowdiness outside of the classroom, 68% saw increases in tardiness, 27% saw increases in students skipping classes, 55% saw increases in the use of electronic devices when not permitted, 39% saw an increase in physical fights between students, and 46% saw an increase in threats of fights between students.[99]

266.   Further exacerbating schools' struggles to teach is that students are skipping school. Indeed, student absenteeism has greatly increased as the youth mental health crisis has intensified. In the 2021–22 school year, 39% of public schools experienced an increase in chronic student absenteeism compared to the 2020–21 school year, and 72% of public schools saw increased chronic student absenteeism compared to school years before the pandemic.[100] Vandalism also increased in 2022, with 36% of public schools reporting increased acts of

---

2026] and Seyyed Mohsen Azizi et al., *The relationship between social networking addiction and academic performance in Iranian students of medical sciences: a cross-sectional study*, 7 BMC Psychol. (May 3, 2019), at https://link.springer.com/article/10.1186/s40359-019-0305-0 [last visited Jan. 20, 2026]). See also Yubo Hou et al, *Social Media Addiction: Its Impact, Mediation, and Intervention*, 13 (1) Cyberpsychology: Journal of Psychosocial Research on Cyberspace (Feb. 2019), at https://www.researchgate.net/profile/Lili-Song-15/publication/331294811_Social_media_addiction_Its_impact_mediation_and_intervention/links/ (last visited Jan. 20, 2026).
[98] Inst. Educ. Sci., U. S. Dept. of Educ., *2022 School Pulse Panel* (2022), at https://ies.ed.gov/schoolsurvey/spp/ (last visited Jan. 20, 2026).
[99] Inst. Educ. Sci., supra note 120.
[100] Inst. Educ. Sci., supra note 120.

student vandalism on school property.[101] Schools have seen a rise in vandalism of school property coinciding with the youth mental health crisis that Defendants' Products have been a substantial factor in causing.

267.   Furthermore, just as excessive video game use can negatively impact students' learning engagement in the classroom, so can it contribute to negative effects among teachers. Overall declines in academic performance can affect school district funding, governmental review metrics, and teacher reviews, in addition to taxing students' mental health. These issues and others stemming from students' excessive video game use, discussed above, also drive declining teacher and staff morale, making retaining and hiring qualified staff more difficult for school districts.[102]

268.   Some of the costs and resource expenditures of school districts forced to address students' problematic social media use include, but are not limited to:

    a.  Expending, diverting, and increasing resources and increasing staff time to confiscate cell phones and other devices;

    b.  Hiring additional counselors, staff, and personnel in response to increased mental health and behavioral issues caused by students' excessive video game use;

---

[101]  Inst. Educ. Sci., supra note 120.

[102]  Cf. Priyanka Nema et al., *Impact of social media distraction on student evaluation of teacher effectiveness*, 37(2) Int'l J. Educ. Mgmt. (Jan. 11, 2023), at https://www.emerald.com/insight/content/doi/10.1108/IJEM-10-2022-0389/full/html (last visited Jan. 20, 2026); Teun Siebers et al, *Social Media and Distraction: An Experience Sampling Study among Adolescents*, 25(3) Med. Psych. (August 23, 2021), at https://www.tandfonline.com/doi/full/10.1080/15213269.2021.1959350 (last visited Jan. 20, 2026); Jia-Qiong Xie et al., *The association between excessive social media use and distraction: An eye movement tracking study*, 58(2) Info. & Mgmt. (March 2021), available at https://www.sciencedirect.com/science/article/abs/pii/S0378720620303530 (last visited Jan. 20, 2026); Rebecca Ruiz, *How social media in the classroom is burning teachers out*, Mashable (Sept. 16, 2023), at https://mashable.com/article/teacher-burnout-social-media-in-the-classroom (last visited Jan. 20, 2026) (teacher noting feeling "burnt out and demoralized" trying to deal with "tectonic shifts in classroom behavior" from students' social media use and "rank[ing] the issue among the top factors contributing to teacher burnout in her educator community; "the emotional and mental strain on teachers managing this problem won't lessen until the technology driving it changes").

Expending, diverting, and increasing time and resources, and increasing staff, to communicate and engage with parents and guardians of students regarding

c. youth mental health, behavioral issues, and attendance problems;

d. Expending, diverting and increasing resources to add additional information technology resources in an attempt limit students' access to video game products and mitigate risks posed by students' excessive video game use;

e. Investing in physical barriers (such as magnetic pouches) to keep students from accessing video game products on school property;

f. Developing new and revised teaching plans to address students' altered learning habits, e.g., reduced attention span, inability to communicate effectively;

g. Providing additional learning support to address students' declining achievement, e.g., after school support, as a result of the negative impact of excessive video game use on students' ability and capacity to learn;

h. Hiring additional mental health personnel;

i. Expending and diverting resources and increasing staff to address student discipline issues caused by Defendants' attracting and addicting students to their video game products;

j. Expending, diverting and increasing resources for modifications to mental health curricula;

k. Expending, diverting, and increasing resources to create education materials for youth, parents, and staff addressing video game addiction and harm;

l. Expending and diverting time and resources, and increasing staff, to route students and youth to counselors and mental health service providers;

m. Expending, diverting, and increasing resources to develop additional mental health resources;

n. Training teachers to help students with their mental health and expending, and diverting time and resources to increase staff and train staff to identify students and youth exhibiting symptoms of mental health issues;

o. Expending, diverting, and increasing resources to update student handbooks and similar materials to address use of Defendants' Products; and

p. Expending, diverting, and increasing resources to update school policies to address use of Defendants' Products.

269. Defendants knew or should have known their actions were having a serious impact on school districts, and have nonetheless refused to change their conduct.

270. This impact on schools is no surprise. Defendants have deliberately targeted school-aged children, while knowing the impact this could have on schools.

271. Plaintiff has expended significant resources addressing excessive video game use and the ensuing addiction in students.

272. Each of these steps taken by Plaintiff's staff and administrators detracts from Plaintiff's core educational mission and the public service it provides, siphoning much-needed resources.

273. Ultimately, Plaintiff requires significant and long-term funding to address the harms to which Defendants have contributed. Plaintiff cannot ignore the ever-increasing behavioral and mental health needs of its students, even if this means diverting resources away from important school functions and lessening the educational experience for all students and their families. Such funding should not come at the expense of the students and fall at the feet of the public. Rather, Defendants must bear the burden of remedying their wrongs.

## 1. DEFENDANTS COULD HAVE AVOIDED HARMING SCHOOL DISTRICTS, INCLUDING PLAINTIFF.

274. Not only did Defendants encourage youth to use their addictive products, Defendants walked through the schools' front doors to introduce their respective Products to students.

275. Defendants offer their respective Products to the public with dangerous, standardized features and designs (discussed more fully herein) that users cannot change.

276. Students within Plaintiff's schools and community (along with millions of other users in the United States) are incredibly valuable to Defendants. Although Defendants' Products are ostensibly free of charge, Defendants charge users for in-game microtransactions that are encouraged through Defendants' use of operant conditioning in their game designs.

277.    Defendants knew or should have known that their respective Products were causing serious harm, with profound rippling negative impacts on public schools and other local government entities.

278.    Defendants could have, but purposefully failed to, design their respective Products to protect and avoid injury to adolescent users and avoid harm to Plaintiff's operations.

279.    Defendants knew or should have known that adolescents' developing brains leave them relatively less able to delay gratification, control impulses, or resist immediately pleasurable social rewards.

280.    Defendants knew or should have known that, as a result of Defendants' game design choices, the more children use video games, the harder it is for them to quit.

281.    Defendants knew or should have known that excessive use of their respective Products has severe and wide-ranging effects on youth mental and physical health.

282.    Defendants knew or should have known that youth are especially vulnerable to long-term harm from their respective Products.

283.    Defendants knew or should have known their conduct would harm school districts, including Plaintiff, as Plaintiff is on the front line of providing education and mental health and social services to minors.

284.    Defendants knew or should have known that the harm caused by permitting minors to use their respective Products would lead to serious mental health issues for children exposed to these products, which are dangerous for their developing minds because of the ways that Defendants design, develop, produce, and operate their video game products. Further, Defendants knew or should have known that school districts, including Plaintiff, would be

required to spend their already-limited financial and human resources to address the fallout of Defendants' attracting and addicting minors to their video game products.

285.   The harm to Plaintiff caused by Defendants' actions was foreseeable. Defendants

286.   purposefully sought to attract and addict minors — who attend Plaintiff's schools and reside in Plaintiff's community — to their video game products and engaged in substantial efforts to promote, distribute and market their products to minors, despite knowing that their design choices made the video game products incredibly dangerous to adolescents. Moreover, while deliberately seeking to attract and addict minors to their respective Products, Defendants were aware that school districts --- which provide adolescents with critical educational, counseling, mental health, social, and disciplinary services — would be forced to address, through financial and human resources, the devastating impact video game addiction is known to have on youth mental health. Accordingly, Plaintiff was in the foreseeable zone of risk from Defendants' targeting of minors who reside in Plaintiff's' community and attend Plaintiff's schools.

287.   Despite the foreseeable harm, Defendants failed to adequately warn youth, their parents, and Plaintiff of the known risks and harms of using their respective Products. Defendants avoided design changes that would have increased youth safety. And Defendants pressed ahead with changes designed to keep children hooked, even though they knew or should have known those changes presented risks to the wellbeing of youth, and that school districts, including Plaintiff, would be forced to divert and increase human and financial resources to address the youth mental health crisis that Defendants caused.

288.   Defendants were in a superior position to control the risks of harm, ensure the safety of their respective Products, and insure against and spread the costs of any harm resulting from their dangerous choices.

## L.   PLAINTIFF-SPECIFIC ALLEGATIONS

289.   Plaintiff is a public school district located in the State of Ohio that serves more than 1,300 students.

290.   Plaintiff is responsible for providing a free appropriate public education to all enrolled students and for promoting their academic, social, and emotional well-being.

291.   Plaintiff employs more than 170 teachers, staff, and administrators. Plaintiff's students are, roughly, equally divided in age between elementary, middle, and high school-age children.

292.   During the relevant time period, a substantial portion of Plaintiff's student population has been exposed to and has regularly used Defendants' products, including but not limited to Defendants' respective Video Game Products on school-owned devices, personal devices brought to school, and at home.

293.   Plaintiff's teachers, counselors, and administrators have observed that a significant number of students report using Defendants' respective Video Game Products daily, often for multiple hours per day on school nights, and substantially longer on weekends and breaks. Students frequently describe playing until late at night, waking up tired, and using substantial discretionary time on Defendants' respective Video Game Products.

294.   Plaintiff has documented instances of students attempting to access Defendants' respective Video Game Products on school networks during instructional time, using school-issued devices to circumvent content filters, and talking about Defendants' respective Video Game Products to the exclusion of other interests or activities. These patterns reflect that

67

Defendants' respective Video Game Products are uniquely prominent and highly influential in the lives of Plaintiff's students.

### 1. Plaintiff's Students Suffer from Video Game Addiction

295. During the relevant time period. Plaintiff's school counselors, school psychologists, and other support staff have increasingly encountered students whose use of Defendants' respective Video Game Products exhibits hallmark symptoms of gaming disorder and problematic gaming behavior. These symptoms include, but are not limited to, impaired control over gaming, prioritizing gaming over schoolwork and social relationships, and continuation or escalation of gaming despite clear negative consequences in school.

296. Plaintiff's staff, parents and guardians have reported to Plaintiff that their students have become "obsessed" with Defendants' respective Video Game Products that they experience anger or distress when asked to stop playing, and that they sneak or lie about their game use. School-based mental-health staff have documented that some students describe needing to play Defendants' games "just to feel normal" or "to calm down," and report feeling irritable, anxious, or depressed when they are not able to play.

297. These patterns have not been fleeting. Plaintiff's counselors and administrators have observed similar gaming-related complaints, referrals, and behavioral patterns for multiple school years, with problems intensifying over time as Defendants expanded and further monetized their products. For many students, the signs of gaming disorder have persisted for at least one to three consecutive school years, if not longer, demonstrating chronic rather than transient difficulties.

298. Plaintiff's staff have used standard school-based screening tools, teacher reports, attendance records, and parent interviews to determine that for their students, use of Defendants' respective Video Game Products is a primary driver of absenteeism, sleep

deprivation, missed assignments, declining grades, classroom disengagement, and social withdrawal. These data points, viewed together, show that Defendants' products have contributed to clinically significant impairment in functioning consistent with symptoms of gaming disorder.

### 2. Consequences and Harm Arising from the Video Game Addiction Among Plaintiff's Student Population.

299. The impacts of Defendants' respective Video Game Products on Plaintiff's students have manifested in concrete and observable harms at Plaintiff's schools. Teachers report students falling asleep in class, struggling to concentrate, and openly acknowledging that they stayed up late playing Defendants' respective Video Game Products instead of completing homework.

300. Plaintiff has seen increased disciplinary incidents related to gaming, including students defying teacher directions to stop using gaming sites, attempting to bypass network restrictions to access Defendants' respective Video Game Products, and conflicts between students over in game events or purchases.

301. For students, engagement with Defendants' respective Video Game Products has contributed to chronic absenteeism, class failures, and the need for special interventions, such as individualized behavior plans, counseling referrals, and special education evaluations.

302. In fact, 20.4% of Plaintiff's students were chronically absent in the 2024-2025 school year.[103]

303. As a direct and proximate result of Defendants' actions and misconduct, Plaintiff has been forced to shoulder the costs of a youth mental-health crisis driven in substantially by students'

---

[103] https://reportcard.education.ohio.gov/district/gap/050138

69

use of Defendants' respective video game products, leaving Plaintiff "holding the bag" for harms it did not create. These costs include, but are not limited to:

a. adding, developing, and revising curricula to educate students and their families on the dangers of excessive video game use and to encourage healthier approaches to video game use;

b. hiring and training additional counselors and staff, and increasing their daily and hourly availability to students, to address the effects of the youth mental health crisis;

c. hiring and training employees to focus on the preparation and submission of grant applications to supplement local funding to address the youth mental health crisis;

d. allocating increasing resources to remove video games from students' mobile devices, including school-issued laptop computers;

e. hiring and training behavioral specialists and administrative staff to address the effects of the youth mental health crisis;

f. contracting with local public health resources to gain access to additional mental health resources, including group therapy, individual therapy, and additional social workers in response to increased anxiety among students and other effects of the youth mental health crisis;

g. increasing full-time access to a school psychologist every day of the school week;

h. incurring additional and escalating costs to further address the effects of the youth mental health crisis, including the purchase and updating of books and other literature to educate students and promote healthier video game use; and

i. purchasing and maintaining software to track instances of student attendance, truancy, and student discipline in response to increased attendance and behavioral issues caused by the youth mental health crisis.

304.   Plaintiff's damages are neither speculative nor overly broad. Plaintiff maintains records including but not limited to records of student attendance, disciplinary incidents, counseling encounters, academic performance, and resource allocation. Plaintiff can identify expenditures and can quantify the actual additional costs, services and supports provided to their students as a result of the harm caused by Defendants' respective video game products.

305. Plaintiff has incurred, and will continue to incur, additional costs to deploy and maintain technological controls to address the harms caused by Defendants' respective Video Game Products on school networks and devices, including but not limited to licensing, configuration, and ongoing management of content-filtering and device-management solutions, as well as the staff time required to monitor and enforce those controls.

306. Plaintiff has also suffered significant non-economic damages in the form of disruption to its educational mission, degradation of classroom climate, and harm to the welfare and development of its students. The presence of students experiencing gaming related impairment undermines peer learning, and diverts teacher focus, and all while leaving district personnel overburdened and exhausted.

307. The harms suffered by Plaintiff were foreseeable to Defendants. Defendants designed, marketed, and monetized their products with full knowledge that children and adolescents are a core user base and that schools are central institutions in children's lives. Defendants specifically targeted educational settings through programs, curricula, and marketing campaigns that invited schools to integrate their products into instruction and after school activities.

308. Defendants knew or should have known that when their highly engaging, operant conditioning based game products were widely adopted by children, the downstream effects would be felt most acutely in school communities like Plaintiff. Schools are the places where children's sleep deficits, attention problems, academic failures, behavioral issues, and social difficulties first become visible at scale, and where public resources must be mobilized to respond.

309.  By choosing to promote their products as beneficial for learning without adequately warning of the risks of gaming disorder or problematic use—especially for children and neurodivergent students—Defendants placed foreseeable, systemic burdens on school districts like Plaintiff, which bear the cost of mitigating the resulting harms.

310.  Plaintiff lacks an adequate remedy at law for the ongoing and future harms caused by Defendants' conduct and therefore seeks equitable relief requiring Defendants to change their practices in ways that directly protect school communities.

311.  Plaintiff seeks an order requiring Defendants to implement adequate controls within their products to limit excessive use and reduce the risk of gaming disorder among school age users, including but not limited to meaningful time use limits, default settings that minimize addictive engagement loops for minors, and tools tailored for school deployment that prevent classroom misuse.

312.  Plaintiff seeks an order requiring Defendants to provide clear, prominent, and scientifically grounded warnings to schools, parents, and users regarding Defendants' use of operant-conditioning techniques, variable reward systems, and other engagement-maximizing design choices, and the associated risk of developing Internet Gaming Disorder and related behavioral and mental-health problems.

313.  Plaintiff further seeks an order requiring Defendants to warn specifically about heightened risks to children and adolescents, and to neurodivergent students—including those with ADHD, autism spectrum disorder, learning disabilities, and other vulnerabilities—who are especially susceptible to compulsive use, difficulty disengaging, and reward seeking behaviors in response to Defendants' game mechanics.

314. Plaintiff seeks equitable relief requiring Defendants to develop evidence-based, healthy-gaming educational programming in consultation with independent child-development, mental-health, and education experts, and to make such programming freely and proactively available to school districts nationwide, including Plaintiff. This programming should be age-appropriate, accessible, and designed for integration into health, technology, and advisory curricula.

315. Plaintiff also seeks an order requiring Defendants to distribute accurate, user friendly materials to schools and families explaining the risks of excessive gaming; signs and symptoms of gaming disorder; strategies for healthy use; and technical steps for limiting or monitoring game use, and to update such materials as scientific understanding and product design evolve.

316. Without such injunctive and equitable relief, Defendants will continue to externalize the costs of their design and marketing choices onto public school districts like Plaintiff, forcing schools to absorb the financial and human toll of student gaming disorder and related harms while Defendants retain the profits from the products that caused those harms.

317. As a direct and proximate result of each Defendants' actions and misconduct, Plaintiff has been injured and harmed, and it is therefore entitled to compensation and other damages under Ohio law.

318. Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior that led to Plaintiff's damages. For this, they should be punished, and punitive damages should be assessed against each Defendant for their respective actions and unlawful conduct.

### 3. Plaintiff's Claims are Timely

319. Plaintiff did not discover the defects and unreasonably dangerous condition of each of Defendants' Products including, but not limited to, the use of operant conditioning behavior

modification systems and the lack of adequate safety features, and the risks associated with their use (including, but not limited to, video game addiction and Internet Gaming Disorder), and could not have discovered the defects and unreasonably dangerous condition of Defendants' Products and the risks associated with their use until recently, due to each Defendants' failure to warn, suppression of important information about the risks of the products, and the risk of video game addiction known by each Defendant to result from the use of their Products, and other acts and omissions. Any knowledge Plaintiff had about the gaming habits of its students is distinct from the knowledge of Defendants' culpable behavior and the basis of a cause of action, with the later being gained within the applicable statute of limitation and repose periods.

320.  Each Defendant had a duty to disclose that their respective Products were unreasonably dangerous, including disclosing the use of operant conditioning behavior modification systems, the lack of adequate safety features, the risk of video game addiction and/or Internet Gaming Disorder (which was known by each Defendant to result from use of their Products as demonstrated by reports and studies finding an increased risk of disordered or addictive behavior with respect to video games and the corresponding physical and psychological injuries), and that the use of Defendants' Products carried with it the serious risk of developing the injuries Plaintiff suffered and of which Plaintiff complains herein. Defendants breached that duty.

321.  Neither Plaintiff nor the general public had knowledge of, and no reasonable way of discovering, the harmful conditions found in each Defendants' Products or the true risks associated with their use at the time Plaintiff used each Defendants' Products.

322.   None of the Defendants notified, informed, or disclosed to Plaintiff or the general public that each of the Defendants' respective Products were unreasonably dangerous, including disclosing the use of operant conditioning behavior modification systems, the lack of adequate safety features, the risk of video game addiction and/or Internet Gaming Disorder (which was known by each Defendant to result from use of their Products as demonstrated by reports and studies finding an increased risk of disordered or addictive behavior with respect to video games and the corresponding physical and psychological injuries), and that the use of Defendants' Products carried with it the serious risk of developing the injuries Plaintiff suffered and of which Plaintiff complains herein.

323.   Because each Defendant failed in their duty to notify Plaintiff and the general public that their Products were unreasonably dangerous, including the use of operant conditioning behavior modification systems, the lack of adequate safety features, the risk of video game addiction and/or Internet Gaming Disorder, and that the use of Defendants' Products carried with it the serious risk of developing the injuries Plaintiff's students suffered and further, actively attempted to conceal these facts, Defendants should be estopped from asserting defenses based on statutes of limitation or repose including, but not limited to, any theories of equitable tolling or contra non valentem.

324.   Further, the relationship of Plaintiff's injuries to each of Defendants' Products including, but not limited to, each Defendants' use of operant conditioning behavior modification systems, the lack of adequate safety features, the risk of video game addiction and/or Internet Gaming Disorder, and that the use of Defendants' Products carried with it the serious risk of developing the injuries Plaintiff's students suffered and the resulting damages of which Plaintiff complains herein, was inherently difficult to discover, in part due to each of the

Defendants' knowing suppression of important safety and risk information, and Plaintiff had no actual or constructive knowledge of the relationship between these injuries and use of each of the Defendants' Products.

325.    Plaintiff's injuries were latent, unknown, or otherwise undiscoverable as they were disguised by each of the Defendants' suppression of the relationship between these injuries and the use of each of the Defendants' Products and other potential causes of injuries in minors.

326.    Plaintiff is a lay party that was, until recently, unaware that their students' exposure to each of Defendants' Products, especially their use of operant conditioning behavior modification systems and lack of adequate safety features, could cause video game addiction and/or Internet Gaming Disorder and corresponding physical and psychological injuries, which Plaintiff must address through additional social services in its schools.

327.    Plaintiff was unaware of any associations between exposure to each of Defendants' Products, including their use of operant conditioning behavior modification systems, the lack of adequate safety features, and the risk of video game addiction and/or Internet Gaming Disorder being made in the media or other avenues of public discourse.

## V.    CAUSES OF ACTION
### COUNT ONE: STRICT LIABILITY –  DESIGN DEFECT
### Ohio Products Liability Act (R. C. 2307.71 et seq.)
### (Product Defect Due to Defective Design – R. C. 2307.75)
### (Against All Defendants)

328.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

329.    As an Ohio governmental entity and body politic, Plaintiff is a person who may assert a product liability claim pursuant to the Ohio Products Liability Act. R. C. 2307.71 et seq.

330. At all relevant times, each Defendant was engaged in the business of designing, formulating, producing, creating, making, constructing, assembling, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, and/or otherwise distributing their respective video game Products used by students within Plaintiff's District and are thus "Manufacturers" under OPLA.

331. Each of Defendants' respective video game products used by students constitute "products" under OPLA as, among other reasons, Microsoft's Xbox system includes the physical gaming console, Minecraft is commercially sold and distributed in physical form, such as on discs, cartridges and packaged retail products with various gaming systems, Roblox is similarly sold as a physically installed part of retail packages with hardware, such as loaded onto the drives of packages like the Xbox One S Roblox Bundle. Importantly, the same defective design features of each of these products are embedded in every version of the product, whether physical or digital, such that no meaningful distinction exists between the versions and the harms they cause.

332. Each of Defendants' respective video game products used by students within Plaintiff's District were defective designed and unreasonably dangerous due to operant conditioning which assured video game addiction would occur in users, including minors, and the lack of necessary safeguards.

333. None of the defects in Defendants' Video Game Products cause injury due to any particular content or expression within any of the games. Instead, the defects and injuries arise from the Defendants' own content.

334. The video game Products that each Defendant placed into the stream of commerce were defectively designed at the time they left each Defendants' control. The Products were

designed to cause addictive and compulsive use, including by minors and young adults and lacked necessary safeguards. The Products are not reasonably fit, suitable, or safe for their intended purpose of playing a game without operant conditioning.

335. The defects in each Defendant's respective designs were present in the Products when the Products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner. Each Defendant's respective Products were expected to and did reach students within Plaintiff's District without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

336. Defendant Roblox's Video Game Products were defective as a result of the intentional implementation of content-agnostic design features designed to drive continuous play, particularly children, through the utilization of operant conditioning techniques in the absence of adequate safeguards. The defects include, but are not limited to, the following:

   a. Variable Ratio Reinforcement Architecture (VRRA): Roblox's core reward delivery system delivers in-game rewards such as items, badges, Robux bonuses or experience points, at statistically unpredictable intervals and is embedded in Roblox's foundational architecture by Roblox – separate from any in-game content;

   b. Loot Box and Mystery Reward Container System (loot boxes): Also embedded in Roblox's foundational architecture, Roblox's loot box and mystery reward container mechanics employ slot machine mechanics to deliver randomized rewards of variable value upon payment of Robux, Roblox's in-game currency maintained by Roblox across all experiences.

   c. Artificial Scarcity and Time-Limited Availability Design: Also called "FOMO Architecture" for its reliance on the fear of missing out, Roblox's content-agnostic and intentional creation of scarcity embedded in its foundational architecture exploits the psychological mechanism of loss aversion to periodically makes items, events and rewards available only during short, non-renewable windows and uses

various countdown timers, urgency notifications, and "last chance" prompts;

d. Daily Log-In Streak and Penalty Architecture: Roblox's content and experience-agnostic streak mechanics embedded in its foundational architecture, including daily logins and streak-break penalties, creates a negative reinforcement loop that operates continuously and independently of positive reinforcement mechanisms;

e. Push Notification Re-Engagement System: Roblox's embedded notification architecture is designed to deliver targeted push notifications during periods of lapsed user engagement, agnostic to and independent of any experience content, to interrupt user's other activities, including sleep and school.

f. Virtual Currency Obfuscation: The embedded architecture of Roblox's Robux virtual currency and in-game purchasing system that funnels all transactions through Robux rather than real dollars severs a user's awareness of the connection between in-game spending and real-dollar cost, regardless of any content being purchased with those Robux.

337. Defendant Microsoft and Mojang's Video Game Products were defective as a result of the intentional implementation of content-agnostic design features designed to drive continuous play, particularly children, through the utilization of operant conditioning techniques in the absence of adequate safeguards. The defects include, but are not limited to, the following:

a. Minecraft Variable Reward Architecture: Minecraft's embedded architecture of content-agnostic loot mechanics, achievement unlock sequences, and mob-drop randomization employ variable ratio reinforcement schedules like those used by slot machines to deliver items at unpredictable intervals.

b. Virtual Currency Obfuscation: The embedded architecture of Minecraft's Minecoins virtual currency and in-game purchasing system that funnels all transactions through Minecoins rather than real dollars severs a user's awareness of the connection between in-game spending and real-dollar cost, regardless of any content being purchased with those Robux.

c. Xbox's Cross-Platform Achievement System: Microsoft's Xbox achievement systems applies to all games played through the Xbox systems drives continuous engagement with the Xbox system itself rather than any particular game using public points, achievement

badges, and social recognition rewards at variable intervals across all games in the Xbox ecosystem.

d.  Minecraft: Education Edition: Microsoft's school-directed version of Minecraft contains the same product defects common to Minecraft, but in a package specifically targeted for classroom and/or educational deployment to school-age children without any of the necessary safeguards.

338.  Defendant's Video Game Products, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as user-imposed time restrictions on gameplay, each Product's design lacking proper minor age verification, and each Product failing to operate as a reasonable user would expect.

339.  Students within Plaintiff's District used Defendants' Video Game Products, including Roblox, Minecraft and Xbox system, in an intended and reasonably foreseeable manner, and the Products were not materially altered prior to their use.

340.  Each Defendant owed a duty to not only the direct users of its Video Game Products, but to all foreseeable victims of harm caused by the Products' defects. Plaintiff is just such a foreseeable victim.

341.  The nature and magnitude of the harm and risks of harm to students in Plaintiff's District and Plaintiff itself were foreseeable because Defendants specifically targeted its products to school-aged children, including students within Plaintiff's District, for both general and educational use. Those children used the Video Game Products for their intended and foreseeable uses, including compulsive and continuous play.

342.   As a clinically significant behavioral addiction recognized by the WHO with an ICD-11 code and the APA in the DSM-5 affecting approximately 1.5% of the estimated 50 million child gamers in the United state, both the risk of and magnitude of the harm associated with Internet Gaming Disorder is foreseeable.[104]

343.   These child gamers, along with their Parents and Plaintiff School District had no awareness of, or capacity to appreciate the operant conditioning mechanisms intentionally embedded in Defendants' Video Game Products due to the Defendants' failure to properly warn of or disclose the risk of Video Game Addition from operant conditioning created by Defendants' engagement of mental health professionals to drive continuous play in pursuit of ever-increasing profits. The psychological mechanisms underlying the addiction risk are not within the ordinary knowledge of parents, educators or children and the pertinent facts were withheld by Defendants.

344.   Similarly, the defects in Defendants' Video Game Products causing these harms to students and to Plaintiff was not only likely and foreseeable because of the behavioral conditioning effects of the games but is in fact the intended and monitored effect of Defendants' designs. Defendants should recognize these risks specifically because they are the intended result of their design and development, as would be recognized by a reasonable manufacturer using the knowledge the Defendants should, and in fact did, possess.

345.  Defendants' designs do not conform to any of the applicable and/or emerging standards related to child-directed digital platforms, including the industry standards, ESRB's evolving

---

[104] *See* Petry, Nancy, Pause and Reset: A Parent's Guide to Preventing and Overcoming Problems with Gaming (2019), pp.17–18.

interactive elements disclosure standards, the FTC's guidance on child-directed marketing, or COPPA Safe Harbor program guidelines.

346.    Because of these intentional design choices by Defendants, the respective Video Game Products are more dangerous than a reasonably prudent consumer would expect when played in the intended manner, as an ordinary and reasonably prudent consumer purchasing a game for their minor child would not expect that a product marketed as an educational tool or "safe, family-friendly" product would conceal operant conditioning systems specifically designed to create behavioral addiction in children. The inconsistency and discrepancies between representations of the product as safe and educational and the employed addiction-generating behavioral science architecture results in a design that is more dangerous than a reasonably prudent consumer would expect.

347.    Reasonable users of Defendants' Products would not expect, and Plaintiff did not expect, that said Products would pose risks of severe video game addiction and the corresponding sequelae of physical and psychological injury, including but not limited to low self-esteem, depression, anxiety, chronic pain, social isolation, social and emotional behavior issues.

348.    Reasonable users of Defendants' Products would not expect that Defendants would conceal the operant conditioning, risks of video game addiction, and sequalae of that addiction, but Defendants nevertheless chose to place their Products into the stream of commerce while knowing of both the concealment and risk of harm.

349.    Each Defendant knew or, by the exercise of reasonable care, should have known that users, including students within Plaintiff's District, would use the Products without anyone inspecting the Products for addictive or other dangerous features.

350. The defects of each of the Defendants' respective Video Game Products are each a substantial factor in causing injuries to students in Plaintiff's District as well as the resulting injuries to Plaintiff itself.

351. At the time each Defendant's Products were designed, developed, distributed to Plaintiff, and played, safer alternative designs existed that were entirely feasible, both technically and economically, and any benefits of the specific addiction-generating design features in Defendants' products have, at best, de minimis legitimate benefits that could not be achieved through non-defective alternative designs, including but not limited to positive reinforcement systems that do not carry the risk of addiction.

352. For example, the defective addiction-generating behavior modification systems are not necessary to provide entertainment value within the products, as that can be accomplished during transparent, fixed-ratio reward systems without variable ratio conditioning. The core game utility of Roblox, Minecraft and the Xbox system do not depend on these addictive features that are merely superimposed on top of the core gaming utility for the specific purpose of generating compulsive engagement.

353. Each Defendant could have utilized cost effective, reasonably feasible alternative designs that eliminated or mitigated the harm caused by their respective Products without impairing the product's utility to users by implementing elements that include, but are not limited to:

    a. Warnings of the use of operant conditioning behavior modification systems;

    b. Lack of informed consent to operant conditioning;

    c. Robust age verification;

    d. Effective parental controls;

    e. The removal of barriers to the enactment of parental controls;

    f. Warnings of health effects of use and extended use upon sign-up;

    g. Opt-in restrictions to the length and frequency of sessions;

h. Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

i. Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

j. Self-imposed limits for microtransactions; and

k. Others as set forth herein.

354. Examples of practical and technically feasible alternative design elements that would have prevented the harm to Plaintiff's students and therefore Plaintiff include, but are not limited to:

a. Fixed-ratio deterministic reward systems: Currently used in other competing platforms like Steam and Nintendo, fixed ratio reward systems deliver a specific, disclosed reward for each specified unit of gameplay and are an alternative to variable ratio loot box mechanics;

b. Hard daily session limits for minor accounts: To limit the exposure to operant conditioning behavior modification systems, Defendants could have implemented effective content-agnostic hard daily session time limits for accounts positively identified as belonging to minor users, as has been implemented in other programs like Apple's Screen Time or Google's Family Link;

c. Real-Dollar Price Display: By displaying real-dollar equivalents alongside virtual currency prices, Defendants could have preserved user's appreciation of the real-dollar value and  the virtual currency functionality while eliminating the payment decoupling effect in their embedded architecture.

d. Notification Restrictions: Defendants could have implemented hard technical restrictions on the timing of push notifications and avoided, for example, disrupting sleep or school hours;

e. Eliminated Loss-Aversion Streak Penalty Architecture: Defendants could have preserved daily engagement incentive programs, such as streak bonuses, while eliminating penalties for breaking those streaks, thereby using positive reinforcement without the negative reinforcement that compels continuous and compulsive gameplay;

f. Robust Age-Differentiated Architecture: Defendants could have implemented technically robust age-verification at account creation, including parental consent verification for minors, and applied a product architecture for minors without the addiction-generating operant conditioning features.

355. Accordingly, the defects in Defendants' Video Game Products are not the result of an inherent characteristic of the products and instead could be eliminated without substantially compromising the products' usefulness or desirability.

356. Instead, each Defendant designed their respective Products to aggressively addict users with operant conditioning aimed to increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

357. Each Defendant could have completely avoided the harm by not utilizing operant conditioning in game design, provided proper game time tracking and a design to limit game play while still providing an optimal gaming experience.

358. At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

359. As a direct and proximate result of the defects in Defendants' Video Game Products, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

360. Defendants' defective Video Game Products have directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

361.   The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

362.   Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' defective products, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

    a.   Student achievement and performance;
    b.   Chronic absenteeism;
    c.   College/career/workforce Readiness;
    d.   Community trust and confidence;
    e.   School-student relationship;
    f.   Parent-school relationship;
    g.   School environment.

363.   The direct and proximate result of the defective aspects of Defendants' products also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

    a.   Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
    b.   Hire additional counselors, staff, and personnel for mental health and disciplinary services;
    c.   Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;
    d.   Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;
    e.   Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;

f.  Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;

g.  Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;

h.  Expend, divert, and increase resources for modifications to mental health curriculum;

i.  Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

j.  Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' products;

k.  Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

l.  Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m.  Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n.  Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and products and the youth mental health crisis;

o.  Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

p.  Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive products targeted to attract and addict minors.

364.  Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours

especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance.

365.  As a direct and proximate result of each Defendant's defective products, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

366.  Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction of operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

367.  In addition to the compensatory and punitive damages sought above, Plaintiff seeks equitable and injunctive relief ancillary to its design-defect claims that is narrowly tailored to the design defects identified herein. Such injunctive relief is necessary as monetary damages alone are insufficient to prevent the ongoing and future harms to students in Plaintiff's District and Plaintiff itself as the direct and proximate result of each of the Defendants' defective designs.

368.  Plaintiff specifically requests that the Court enter an order requiring each of the Defendants, at its own cost, to correct the content-agnostic design defects in their respective Video Game Products as they relate to users under the age of 18, including but not limited to:

a.  Implementation of robust age verification and age-gated architecture: Defendants shall design, implement and maintain a commercially reasonably age-verification system for all new and existing accounts that reasonably and effectively distinguishes users under 18 and applies a differentiated "minor-safe" architecture to all minor accounts that, at a minimum, disables or substantially modifies the addiction-generating design features identified in this Complaint, including but not limited to variable-ratio loot mechanics, streak-penalty systems, artificial scarcity/FOMO events, and cross-platform compulsion mechanics for such minor-associated accounts;

b.  Implementation of hard session time limits and curfews for minors: For positively associated minor accounts, Defendants shall implement hard daily session-time limits calibrated to accepted pediatric screen-time guidance, and hard "curfew" windows during which minor-associated accounts cannot initiate or continue gaming sessions (e.g. overnight and school hours) without affirmative parental/guardian overrides through a verified parental control portal or mechanism'

c.  Correction of notification architecture: For positively minor-associated accounts, Defendants shall redesign their embedded and content-agnostic notification architecture so eliminate push notifications during school or overnight hours absent a verified parent opt-in;

d.  Reform of virtual-currency architecture: For positively minor-associated accounts, Defendants shall redesign their embedded and content-agnostic virtual currency system to eliminate the intentional decoupling of in-game spending from real-dollar cost by displaying the real-dollar equivalent of every virtual currency price at the point of purchase and disabling or strictly limiting "one-click" repeat-purchase flows for minors.

369.  Plaintiff further respectfully requests that the injunction require Defendants to submit to court-supervised monitoring for a reasonable period of time during which Defendants must certify compliance with the ordered design changes and refrain from deploying new features materially similar in function to the enjoined design mechanisms without advance notice to Plaintiff and the Court.

**COUNT TWO: STRICT LIABILITY –  FAILURE TO WARN**
**Ohio Products Liability Act (R. C. 2307.71 et seq.)**
**(Product Defect Due to Inadequate Warning or Instruction – R. C. 2307.76)**

89

**Against All Defendants**

370. Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

371. As an Ohio governmental entity and body politic, Plaintiff is a person who may assert a product liability claim pursuant to the Ohio Products Liability Act. R. C. 2307.71 et seq.

372. At all relevant times, each Defendant was engaged in the business of designing, formulating, producing, creating, making, constructing, assembling, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, and/or otherwise distributing their respective video game Products used by students within Plaintiff's District and are thus "Manufacturers" under OPLA.

373. Each of Defendants' respective video game products used by students constitute "products" under OPLA as, among other reasons, Microsoft's Xbox system includes the physical gaming console, Minecraft is commercially sold and distributed in physical form, such as on discs, cartridges and packaged retail products with various gaming systems, Roblox is similarly sold as a physically installed part of retail packages with hardware, such as loaded onto the drives of packages like the Xbox One S Roblox Bundle. Importantly, the same defective design features of each of these products are embedded in every version of the product with the same lack of warning or disclosure, whether physical or digital, such that no meaningful distinction exists between the versions and the harms they cause.

374. Defendants knew that their respective Products concealed the built-in operant conditioning, rendering the games unreasonably dangerous, harmful, capable of causing—and in fact were designed to cause—compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

375.   Each of Defendants' respective video game products used by students within Plaintiff's District were defective designed and unreasonably dangerous due to operant conditioning which assured video game addiction would occur in users, including minors, and the lack of necessary safeguards.

376.   Each Defendant knew, or in the exercise of reasonable care should have known, of the specific risk of Internet Gaming Disorder in minor users associated with the deliberate deployment of content-agnostic addiction-generating operant conditioning features in their respective Video Game Products, even when used in by students in Plaintiff's District in a reasonably foreseeable manner.

377.   Defendants' knew of their intentional use of operant conditioning within their respective Video Game Products, and likewise knew or should have known about the harm that posed on the basis of multiple bases of information, including but not limited to:

> a.  Internal analytics: The function of many of the operant conditioning features required tracking and analysis of user behavior for execution, and such tracking would have also revealed the disordered behavior of users, including students in Plaintiff's District;
> b.  Employed expert knowledge: The expertise and knowledge of the psychologists and other mental health professionals engaged by Defendants would have also recognized the disordered behavior of users, including students in Plaintiff's District, and the specific clinical risks posed by defective embedded architecture like variable ratio reward architecture; and
> c.  Published scientific knowledge: Although not generally known by the public, like Plaintiff, peer-reviewed research establishing the addiction-generating properties of the operant conditioning mechanisms used by Defendants was available to the Defendants as early as 2012.

378.   Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of their respective Video Game Products, nor have been capable of knowing that operant conditioning was being used on players in the games.

91

379.   At the time Defendants' Products left Defendants' control, they did not include—nor have

they ever included—warnings that the Products pose an unreasonable risk of harm to users,

particularly minors. The inclusion of operant conditioning to increase continuous gameplay

was concealed from parents, players, and schools. The resulting probability and seriousness

of harm was unethical and void of any disclosure of the risks. The burden of informing the

public at large that operant conditioning was being utilized, thereby facilitating informed

decisions about use of the product and consent to allowing operant conditioning behavior

modification systems, is not a high burden and, furthermore, is mandated for the licensed

psychologists who were employed by Defendants.

380.   Defendants failed to provide warning or instructions that a manufacturer exercising

reasonable care would have provided, through failures including but not limited to:

     a. No warning of operant conditioning: No user-facing product
documentation, including but not limited to app store listing, load
screens, terms of service or in-game interfaces, contained any warning
the Defendants' systems create a risk of gaming disorder in minor or
neurodivergent gamers like students in Plaintiff's District;  the use of
operant conditioning behavior modification systems and/or addiction-
generating behavior mechanisms in the Defendants' respective Video
Game Products;

     b. No warning of psychologist involvement: No user-facing product
documentation, including but not limited to app store listing, load
screens, terms of service or in-game interfaces, contained any warning
that Defendant's engaged the assistance of behavioral psychology
professionals to intentionally design the games to drive continuous and
compulsive play;

     c. No warning of addiction risk in product documentation: No user-facing
product documentation, including but not limited to app store listing,
load screens, terms of service or in-game interfaces, contained any
warning that the Defendants' systems create a risk of gaming disorder
in minor or neurodivergent gamers like students in Plaintiff's District;

     d. No warning of addiction risk in product documentation: No user-facing
product documentation, including but not limited to app store listing,

load screens, terms of service or in-game interfaces, contained any warning of the types of symptoms or criteria associated with Internet Gaming Disorder;

e.  No disruptive engagement usage warning: No user-facing product documentation, including but not limited to app store listing, load screens, terms of service or in-game interfaces, contained any warning that Defendants' respective Video Game Products utilized disruptive notifications to compel engagement during periods of decreased use, such as during school or sleep time;

f.  No minor-specific warnings: No user-facing product documentation, including but not limited to app store listing, load screens, terms of service or in-game interfaces, contained any warning that minors and neurodivergent users were more likely to suffer harmful effects, including the development of Internet Gaming Disorder, from the behavior modification systems used by Defendants in their respective products.

381.  Each Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

a.  Warnings of the use of operant conditioning behavior modification systems;

b.  lack of informed consent to operant conditioning in the games;

c.  failing to warn users, parents and schools that operant conditioning was used in the games;

d.  failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

e.  failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

f.  failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

g.  failed to issue warnings to consumers regarding the dangerous risks of the Products even after the sale and/or download of their Products; and

h.  representing that the Products were and are safe for use, when in fact, Defendants knew or should have known that their Products were

93

designed to cause minors to engage in excessive use until they developed an addiction or disordered compulsion to use the Products.

382.  Moreover, each Defendant's non-feasance, failure to act, and omissions in the development, set up, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective Products rendered the product unreasonably dangerous. Those failures include but are not limited to:

  a. Incorporating operant conditioning into the infrastructure of game play to reward continuous video game play;
  b. Designing the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third parties;
  c. Failing to implement effective parental controls;
  d. Failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of Products, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;
  e. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable Products and upgrades and in-game purchases and/or microtransactions; and
  f. Failing to implement reasonably available means to allow users or their parents to limit or deter use of Products by minors during ordinary times for school or sleep.

383.  Each Defendant's failure to adequately warn about its defective Product created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Product.

384.  Furthermore, Defendants each failed to provide adequate post-marketing warnings throughout their respective Video Game Product's commercial life, including but not limited to times such as upon the World Health Organization's publication of the ICD-11 Internet Gaming Disorder classification in 2018 and effective adoption in 2022.

385. Each Defendant made product updates and released new versions of their Video Game Products without implementing any addiction risk warning in the updated products.

386. At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

387. A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff of the dangers of its Product.

388. Reasonable users of Defendants' Products would not expect, and Plaintiff did not expect, that said Products would pose risks of severe video game addiction and the corresponding sequelae of physical and psychological injury, including but not limited to low self-esteem, depression, anxiety, chronic pain, social isolation, social and emotional behavior issues.

389. Reasonable users of Defendants' Products would not expect that Defendants would conceal the operant conditioning, risks of video game addiction, and sequalae of that addiction, but Defendants nevertheless chose to place their Products into the stream of commerce while knowing of both the concealment and risk of harm.

390. Each Defendant knew or, by the exercise of reasonable care, should have known that users, including students within Plaintiff's District, would use the Products without anyone inspecting the Products for addictive or other dangerous features.

391. The defects of each of the Defendants' respective Video Game Products, and the lack of warning thereof, are each a substantial factor in causing injuries to students in Plaintiff's District as well as the resulting injuries to Plaintiff itself.

392. The risk of addiction and resulting harms is not an open and obvious risk of the Defendant's respective Video Game Products, not is it a matter of common knowledge among the relevant

consumer population, such as the parents of the children in Plaintiff's District. To the extent Defendants treated the specific behavioral science mechanisms used in their products as proprietary, trade secrets or other confidential information, the public was prevented from knowing of their presence and corresponding risk of harm.

393.   Had Defendants' warned users, like students in Plaintiff's District, of the risks of their products, those that would not used or discontinued use of the Video Game Products would have reduced the harm and burden to Plaintiff, thereby mitigating or eliminating the harm and loss to Plaintiff. Furthermore, proper warning would have allowed Plaintiff to take proactive steps to reduce the harm to itself, including but not limited to implementation of correcting programing and resource allocation prior to the full development of the harm. Plaintiff been aware that the Products could cause significant harm, including an increased risk of suicide and severe mental health effects, it would not have allowed use of each Defendant's respective Product.

394.   The addictive nature of each Defendant's defective Product and failure to warn about said Products actually and proximately caused Plaintiff's video game addiction, compulsiveness, and resulting physical, psychological, emotional and economic harm.

395.   As a direct and proximate result of the defects in Defendants' Video Game Products, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

396.   Defendants' defective Video Game Products have directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional

distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

397. The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

398. Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' defective products, Plaintiff suffers institutional harms that are not economic losses, including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

    a. Student achievement and performance;
    b. Chronic absenteeism;
    c. College/career/workforce Readiness;
    d. Community trust and confidence;
    e. School-student relationship;
    f. Parent-school relationship;
    g. School environment.

399. The direct and proximate result of the defective aspects of Defendants' products also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

    a. Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
    b. Hire additional counselors, staff, and personnel for mental health and disciplinary services;
    c. Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;

d. Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;

e. Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;

f. Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;

g. Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;

h. Expend, divert, and increase resources for modifications to mental health curriculum;

i. Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

j. Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' products;

k. Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

l. Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m. Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n. Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and products and the youth mental health crisis;

o. Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

p. Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive products targeted to attract and addict minors.

400.  Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance,

401.  Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

402.  In addition to the compensatory and punitive damages sought above, Plaintiff seeks equitable and injunctive relief requiring adequate warnings and disclosures that a reasonably careful manufacturer would now provide, given Defendants' knowledge of the risks alleged in this count. Such injunctive relief is necessary as monetary damages alone are insufficient to prevent the ongoing and future harms to students in Plaintiff's District and Plaintiff itself as the direct and proximate result of each of the Defendants' failure to provide adequate warnings or disclosures.

403.  Plaintiff therefore respectfully requests that the Court order Defendants to:

  a.  Provide clear addiction-risk warnings at onboarding and login: Defendant shall add conspicuous, plain language warning at account creation, login screens and core menus for all positively minor- associated accounts and in all parent-facing documentation that (a)

explain that the Defendants' respective Video Game Products employ behavioral conditioning techniques and variable-ratio reward systems; (b) that such systems are associated with a clinically-recognized condition called Gaming Disorder or Internet Gaming Disorder, and (c) describe in terms understandable to laypersons the specific signs and symptoms of gaming disorder in children;

b. Disclose operant conditioning behavioral design architecture: Defendants shall add disclosures parent-facing materials and online information centers that explain in terms understandable to laypersons the presence and function of (a) variable-ratio loot/reward systems; (b) streak and return-day mechanics; (c) time-limited event and artificial scarcity systems; (d) disruptive notification timing to maximize re-engagement; and (e) virtual currency decoupling mechanism;

c. Warn about minor-specific vulnerability: For positively minor-associated accounts, Defendants shall include explicit warnings at account creation, login screens and core menus for all such accounts and in all parent-facing documentation an explicit warning that children and adolescents are more vulnerable than adults to conditioning and addictions from the types of behavioral modification systems described herein and that parents should closely monitor and limit use by minors;

d. Warn about school and overnight-hours risks: For all positively minor-associated accounts, Defendants shall include explicit warnings at account creation, login screens and core menus for all such accounts and in all parent-facing documentation explicit and prominent warning that excessive use and use during school and overnight hours can impair learning, attention, and behavior in school, and instruct parents on how to configure settings to limit or prevent such use.

404. Plaintiff also respectfully requests an order requiring Defendants to issue corrective communications, such as email notices, in-product messages, and updates to all app-store listing and marketing sites, informing users, parents and the public of the newly required warning and disclosures along with the availability of enhanced parental control features.

**COUNT THREE: STRICT LIABILITY – FAILURE TO CONFORM**
**Ohio Products Liability Act (R. C. 2307.71 et seq.)**
**(Product Defect Due to Failure to Conform to Representations – R. C. 2307.77)**
**Against All Defendants**

405.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

406.   As an Ohio governmental entity and body politic, Plaintiff is a person who may assert a product liability claim pursuant to the Ohio Products Liability Act. R. C. 2307.71 et seq.

407.   At all relevant times, each Defendant was engaged in the business of designing, formulating, producing, creating, making, constructing, assembling, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, and/or otherwise distributing their respective video game Products used by students within Plaintiff's District and are thus "Manufacturers" under OPLA.

408.   Each of Defendants' respective video game products used by students constitute "products" under OPLA as, among other reasons, Microsoft's Xbox system includes the physical gaming console, Minecraft is commercially sold and distributed in physical form, such as on discs, cartridges and packaged retail products with various gaming systems, Roblox is similarly sold as a physically installed part of retail packages with hardware, such as loaded onto the drives of packages like the Xbox One S Roblox Bundle. Importantly, the same defective design features of each of these products are embedded in every version of the product, whether physical or digital, such that no meaningful distinction exists between the versions and the harms they cause.

409.   Each Defendant made express representations of material fact concerning the character, quality, safety of its respective Video Game Products that constitute "representations" under OPLA.

410.   Defendant Roblox made representations regarding its Video Game Product including, but not limited to, the following:

    a. Express representations as to the safety of Roblox, including to it being a "safe place to play for kids of all ages;"[105]

    b. Express representations in the Parent's Guide as to the character of the parental controls, such as stating the Roblox provides parents "the tools they need to help ensure their children have a safe experience;"[106]

    c. Express representations concerning the character and quality of Roblox as an education resource, including that it is "trusted by educators worldwide as a learning tool;"[107]

    d. Express representations by Roblox's CEO David Baszucki that Roblox is "one of the safest and most positive places on the internet for young people;"[108] and

    e. Roblox's marketing and promotion of its product to the "Everyone 10+" ESRB rating representing its safety for that age group.

411. Defendant Microsoft made representations regarding its Video Game Products including, but not limited to, the following:

    a. Express representations concerning the character and quality of Minecraft: Education Edition as an education resource;

    b. Express representations as to the safety of Minecraft: Education Edition, including that it is "safe for students;"[109]

    c. Express representations that its Xbox Family Settings give parents "complete control" over their children's gaming activity and creates a "safe gaming environment" for children;[110] and

    d. Express representations by Microsoft's CEO of Gaming that Xbox is designed to provide a "healthy gaming experience" for children.[111]

---

[105] Roblox, *Safety Center – Safety Policies & Resources*, ROBLOX, https://about.roblox.com/safety (last visited Feb. 20, 2026).

[106] Roblox, *Safety Tools and Policies*, ROBLOX, https://about.roblox.com/safety-tools (last visited Feb. 20, 2026).

[107] Roblox Corp., Roblox Creates Free Digital Civility Curriculum; Launches Roblox Game as Engaging Tool for Educators to Teach Course Online (July 23, 2020), https://ir.roblox.com/news/news-details/2020/Roblox-Creates-Free-Digital-Civility-Curriculum-Launches-Roblox-Game-as-Engaging-Tool-for-Educators-to-Teach-Course-Online/default.aspx.

[108] Roblox CEO on Platform's Safety Efforts as Congress Works to Protect Kids Online, HERE & NOW (WBUR radio broadcast July 23, 2025), https://www.wbur.org/hereandnow/2025/07/23/roblox-ceo-david-baszucki.

[109] Minecraft Educ., *Features of Minecraft Education*, MINECRAFT.EDU., https://edusupport.minecraft.net/hc/en-us/articles/360047117032-Features-of-Minecraft-Education (last visited Feb. 20, 2026).

[110] Xbox Family Settings: Peace of Mind for Parents, XBOX.COM, https://www.xbox.com/en-US/family-hub (last visited Feb. 20, 2026).

[111] Xbox Mobile Games App Store Announced, TAPTAP.IO (Apr. 16, 2023), https://www.taptap.io/post/5135231

412.   As a result of the myriad product defects present in the Defendants' respective Video Game Products, Defendants' products each failed to conform to the express representations as to material fact concerning the character, quality or safety of a product. This includes but is not limited to the intentional embedded use of addiction-generating behavior modification systems within the architecture of their respective products, aimed at the user population most vulnerable to harmful effects, all for the pursuit of ever higher profits. It also includes the failure to implement robust and effective parental control functions, age verification, or other necessary content-agnostic safeguards. None of these failures to conform to representations result from any particular content or expression within Defendants' Video Game Products, but instead arise from Defendants' own conduct.

413.   These failures to conform to Defendants' representations existed at the time the Video Game Products left the Defendants' control.

414.   Each Defendant could have utilized cost effective, reasonably feasible alternative designs that eliminated or mitigated the harm caused by their respective Products without impairing the product's utility to users by implementing elements that include, but are not limited to:

   a.   Warnings of the use of operant conditioning behavior modification systems;
   b.   Lack of informed consent to operant conditioning;
   c.   Robust age verification;
   d.   Effective parental controls;
   e.   The removal of barriers to the enactment of parental controls;
   f.   Warnings of health effects of use and extended use upon sign-up;
   g.   Opt-in restrictions to the length and frequency of sessions;
   h.   Self-limiting tools, including but not limited to session time notifications, warnings, or reports.
   i.   Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);
   j.   Self-imposed limits for microtransactions; and
   k.   Others as set forth herein.

415.  At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

416.  As a direct and proximate result of the defects in Defendants' Video Game Products, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

417.  Defendants' defective Video Game Products have directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

418.  The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

419.  Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' defective products, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

a. Student achievement and performance;
b. Chronic absenteeism;
c. College/career/workforce Readiness;
d. Community trust and confidence;
e. School-student relationship;
f. Parent-school relationship;
g. School environment.

420. The direct and proximate result of the defective aspects of Defendants' products also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

a. Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
b. Hire additional counselors, staff, and personnel for mental health and disciplinary services;
c. Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;
d. Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;
e. Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;
f. Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;
g. Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;
h. Expend, divert, and increase resources for modifications to mental health curriculum;
i. Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;
j. Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;
k. Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;
l. Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g.

105

       reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m.  Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n.  Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o.  Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

p.  Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

421.  Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance.

422.  As a direct and proximate result of each Defendant's defective products, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

423.  Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children-

manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

424.   In addition to the compensatory and punitive damages sought above, Plaintiff seeks equitable and injunctive relief requiring Defendants to bring their respective Video Game Products into conformity with their representations for minor users or cease making such representations and substitute truthful disclosures. Such injunctive relief is necessary as monetary damages alone are insufficient to prevent the ongoing and future harms to students in Plaintiff's District and Plaintiff itself as the direct and proximate result of each of the Defendants' failure to conform to their explicit representations regarding their Video Game Products.

425.   Plaintiff respectfully requests that a Court order that requires Defendants:

   a.   Align product design with "safe for kids" representations: For all positively minor-associated accounts, Defendants shall remove or substantially mitigate the design features, including operant conditioning features and insufficient safeguards, that make their Video Game Products unsafe as alleged or, alternatively, discontinue any such representations of safety;

   b.   Align "educational" products with educational claims: For any Video Game Product marketed as an educational tool or designed for learning, Defendant shall remove or materially disable addiction-oriented engagement mechanics for student accounts and certify that any remaining mechanics have a demonstrable instructional purpose.

   c.   Correct or withdraw misleading marketing: Defendants shall revise all marketing, app-store descriptions, and educator or parent-facing materials that describe their products as safe, healthy, or educational in ways inconsistent with the actual design or, in the alternative, withdraw those claims and replace them with non-misleading descriptions and disclosures of material risks and limitations for minor users.

426.   Plaintiff further respectfully requests that the injunction require Defendants to implement and expose meaningful parental controls, such as robust age-verification, time-of-day use controls, or spending caps that are actually accessible and usable by typical parents.

### COUNT FOUR: NEGLIGENCE
### (Against All Defendants)

427.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

428.   Defendants owe a duty of care to those who are foreseeably within the zone of danger created by their conduct, a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

429.   Accordingly, Defendants owed a duty of reasonable care the minor students enrolled in Plaintiff's District because of the Defendants' conduct in engaging behavioral psychologists and other professionals to generate gaming disorder in its customers in the quest to maximize profit at the expense of the safety of its customers. Especially the targeting of minor gamers, a population that is legally, cognitively, and neurologically incapable of fully appreciating addictive risk or providing informed consent to behavioral modification.

430.   Defendants owe an elevated duty of care to that population, especially to avoid causing addiction in that population, as a reasonable manufacturer in Defendants' position would have recognized minors heightened susceptibility to addiction resulting from the content-agnostic operant conditioning systems deliberately deployed by Defendants.

431.   This duty is owed separately from liability arising from the defects in design, warning and conformity with representations demonstrated in Defendants' respective Video Game Products. Plaintiff's claims for Defendants' breaches of the duty of care asserted in this count are separate and distinct the Plaintiff's product liability claims arising from the defects in

design, warning or conformity with representations as to the respective Video Game Products. Instead, Plaintiff's negligence claim looks to Defendant's conduct.

432.   Defendants also owed a duty of reasonably care to foreseeable institutional downstream victims such as Plaintiff that would foreseeably bear the economic and operation burdens of students' gaming disorder. This duty results from Defendants' knowledge of:

      a.   Their targeting of school-age children, that gaming disorder impairs academic function and performance, and produces behavioral disruption in school settings; and

      b.   Public school districts' function as the primary institutions responsible for education children and addressing the education consequences of students' health conditions.

433.   A reasonable manufacturer in Defendants' position would have foreseen that designing products to create gaming disorder in children would directly harm the school institutions charged with educating those children.

434.   As a result of their voluntary retention of behavioral psychologists and designing behavior modification engagement systems specifically targeting minors, Defendants assumed a duty of care to conduct that activity reasonably and without causing foreseeable harm and an obligation to exercise care proportionate to the severity of harm those tools were known to risk.

435.   By virtue of their affirmative representations that their respective Video Game Products were safe and appropriate for children and assisted with education, Defendants created an independent duty not to market products known to pose a risk of behavioral addiction to minor users.

436.   Each Defendant breached their duty of care through their specific conduct unrelated to any gaming content or expression, including but not limited to inducing, promoting and otherwise facilitating the use of operant conditioning behavior modification systems on minors without

109

adequate warning or informed consent and by inducing, promoting and otherwise facilitating psychological professionals to violate their applicable standards of care, including but not limited to the APA Code of Conduct, in the development and promotion of Defendants' Products.

437. Each Defendant was also negligent by actively working to suppress diagnosis and treatment of video game addiction.

438. Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care and committing these breaches. Each Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

439. At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

440. As a result of each Defendant's breach of the herein identified duties and resulting negligence, minor students in Plaintiff's District suffered from video game addiction and related injuries.

441. Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

442. As a direct and proximate result of Defendants' negligence, a substantial number of students enrolled in Plaintiff's District developed Internet Gaming Disorder. This was not an unintended side effect but rather the designed and measured outcome of Defendants' conduct. These harms then flowed directly, and unbroken by any independent third party, to the

institutional harm suffered by Plaintiff as the school district.  That is, Plaintiff is the foreseeable institutional victim that the Defendants' duty of care was designed to protect.

443.  The nature and magnitude of the harm and risks of harm to students in Plaintiff's District and Plaintiff itself were foreseeable because Defendants specifically targeted its products to school-aged children, including students within Plaintiff's District, for both general and educational use. Those children used the Video Game Products for their intended and foreseeable uses, including compulsive and continuous play.

444.  As a clinically significant behavioral addiction recognized by the WHO with an ICD-11 code and the APA in the DSM-5 affecting approximately 1.5% of the estimated 50 million child gamers in the United state, both the risk of and magnitude of the harm associated with Internet Gaming Disorder is foreseeable.

445.  These child gamers, along with their Parents and Plaintiff School District had no awareness of, or capacity to appreciate the operant conditioning mechanisms intentionally embedded in Defendants' Video Game Products due to the Defendants' failure to properly warn of or disclose the risk of  Video Game Addition from operant conditioning created by Defendants' engagement of mental health professionals to drive continuous play in pursuit of ever-increasing profits. The psychological mechanisms underlying the addiction risk are not within the ordinary knowledge of parents, educators or children and the pertinent facts were withheld by Defendants.

446.  As a direct and proximate result of Defendants' negligent conduct, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

447.   Defendants' negligent conduct, has directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

448.   The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

449.   Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' negligent conduct, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

        a.  Student achievement and performance;
        b.  Chronic absenteeism;
        c.  College/career/workforce readiness;
        d.  Community trust and confidence;
        e.  School-student relationship;
        f.  Parent-school relationship;
        g.  School environment.

450.   The direct and proximate result of the Defendants' negligent conduct also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

        a.  Expend, divert and increase human and financial resources to provide additional mental health resources to minors;

b.  Hire additional counselors, staff, and personnel for mental health and disciplinary services;

c.  Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;

d.  Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;

e.  Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;

f.  Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;

g.  Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;

h.  Expend, divert, and increase resources for modifications to mental health curriculum;

i.  Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

j.  Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

k.  Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

l.  Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m.  Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n.  Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o.  Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

       p.   Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

451.   Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance.

452.   As a direct and proximate result of each Defendant's negligent conduct, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

453.   Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

454.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children-manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

### COUNT FIVE: NEGLIGENT SUPERVISION
### Against All Defendants

455.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

456.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by  students in Plaintiff's District, each of which are defective and unreasonably dangerous.

457.   Each Defendant maintained employment and agency relationships with various professionals, including behavioral psychologists, child development experts, neuromarketing scientists, user experience designers and product development engineers, to develop, design, manage operate, label, market and control their respective Video Game Products subject to the control, direction, supervision and managerial oversight of the Defendants.

458.   Defendants knew, or should have known, that these personnel were engaged in work with a specific propensity to cause the harm through the addition-generating behavior modification systems they were designing. This knowledge comes first and foremost from the specific direction and intent of Defendants to drive continuous play in order to maximize profits. It also arises from the personnel's own research, the mechanism's engagement metrics, and industry awareness that had not spread to lay persons or entities like Plaintiff.

459.   Defendants failed to properly supervise these personnel or exercise reasonable care in such supervision, including but not limited to supervisory failures such as:

      a.   Failing to ensure the personnel worked within the applicable ethical and professional standards applicable to each licensure and role;

      b.   Failing to implement any meaningful ethic review, child safety review, or addiction-risk assessment as part of the product development cycle;

     c. Focusing performance evaluations upon engagement and revenue metrics without countervailing criteria related to user wellbeing, addiction risk, or compliance with child safety principles;

     d. Failing to require investigation of signals or indications that the engagement patterns were more consistent with compulsive, addictive use than voluntary use; and

     e. Failing to require develop of separate, non-addictive engagement systems for use with minor users.

460. Defendants' negligent supervision of their personnel, as well as each specific failure, was a substantial factor in the harm experienced by students in Plaintiff's district as well as Plaintiff and was a direct and proximate cause of the harms suffered by students enrolled in Plaintiff's District and Plaintiff.

461. Had Defendants exercised reasonable oversight over their personnel, the operant conditioning systems that were employed without informed consent and warning would not have been designed, deployed, or maintained.

462. Defendants knew or should have known their failure to provide adequate supervision would result in the harm to students in Plaintiff's District and Plaintiff as demonstrated in this Complaint.

463. As a direct and proximate result of Defendants' negligent supervision, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

464. Defendants' negligent supervision has directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage,

anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

465.  The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

466.  Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' negligent supervision, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

    a.  Student achievement and performance;
    b.  Chronic absenteeism;
    c.  College/career/workforce Readiness;
    d.  Community trust and confidence;
    e.  School-student relationship;
    f.  Parent-school relationship;
    g.  School environment.

467.  The direct and proximate result of Defendants' negligent supervision, also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

    a.  Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
    b.  Hire additional counselors, staff, and personnel for mental health and disciplinary services;
    c.  Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;

d. Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;

e. Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;

f. Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;

g. Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;

h. Expend, divert, and increase resources for modifications to mental health curriculum;

i. Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

j. Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

k. Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

l. Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m. Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n. Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o. Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and

p. Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

118

468.   Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants' negligent supervision, due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance.

469.   As a direct and proximate result of each Defendant's negligent supervision, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

470.   Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

471.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

## COUNT SIX: NEGLIGENT TRAINING
### (Against all Defendants)

472.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

119

473.  At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

474. Each Defendant maintained employment and agency relationships with various professionals, including behavioral psychologists, child development experts, neuromarketing scientists, user experience designers and product development engineers, to develop, design, manage operate, label, market and control their respective Video Game Products subject to the control, direction, supervision and managerial oversight of the Defendants.

475.  Defendants knew, or should have known, that these personnel were engaged in work with a specific propensity to cause the harm through the addition-generating behavior modification systems they were designing. This knowledge comes first and foremost from the specific direction and intent of Defendants to drive continuous play in order to maximize profits. It also arises from the personnel's own research, the mechanism's engagement metrics, and industry awareness that had not spread to lay persons or entities like Plaintiff.

476.  Defendants failed to provide adequate training to their personnel through training deficiencies including but not limited to:

      a.  Training personnel to apply dangerous behavior modification techniques without adequate ethical or safety limits and/or safeguards;

      b.  Failing to provide adequate child safety training, such as to age-appropriate design, minor-directed product responsibility, or best practices for age-differentiated systems.

    c.   Training personnel against solely engagement metrics that drive addictive behavior without counterbalancing training in harm recognition and child safety;

    d.   Failing to provide training to distinguish between engaging and addictive design; and

    e.   Failing to provide training on ethical and appropriate applications of behavioral psychology to product design.

477.   Defendants knew or should have known their failure to provide adequate training would result in the harm to students in Plaintiff's District and Plaintiff as demonstrated in this Complaint. This knowledge arises from Defendants' own hiring practices, published ethical standards, regulatory and public scrutiny, and pre-existing knowledge of the harm through internal analytics.

478.   As a direct and proximate result of Defendants' failures to provide adequate training, the opportunities to mitigate or prevent the harm arising from the personnels activities were missed, including but not limited to recognition of the clinical harm posed to children, application of professional ethical standards that would have required modification or elimination of these addition-generating systems, allowed the design of age-differentiated engagement systems that achieved reasonable commercial goals without harming children, and properly escalating harm-risk concerns to trigger proper review and modification of harmful practices.

479.   As a direct and proximate result of Defendants' failures to provide adequate training, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

480.   Defendants' failures to provide adequate training have directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but

not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

481.   The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

482.   Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' failures to provide adequate training, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

      a.   Student achievement and performance;
      b.   Chronic absenteeism;
      c.   College/career/workforce Readiness;
      d.   Community trust and confidence;
      e.   School-student relationship;
      f.   Parent-school relationship;
      g.   School environment.

483.   The direct and proximate result of Defendants' failures to provide adequate training also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

      a.   Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
      b.   Hire additional counselors, staff, and personnel for mental health and disciplinary services;

c.  Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;

d.  Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;

e.  Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;

f.  Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;

g.  Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;

h.  Expend, divert, and increase resources for modifications to mental health curriculum;

i.  Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

j.  Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

k.  Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

l.  Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m.  Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n.  Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o.  Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and;

p.  Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

123

484.   Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance.

485.   As a direct and proximate result of each Defendant's failures to provide adequate training, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

486.   Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

487.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

## COUNT SEVEN: VICARIOUS LIABILITY
### (Against All Defendants)

488.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

489.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

490.   Each Defendant maintained employment and agency relationships with various professionals, including behavioral psychologists, child development experts, neuromarketing scientists, user experience designers and product development engineers, to develop, design, manage operate, label, market and control their respective Video Game Products subject to the control, direction, supervision and managerial oversight of the Defendants.

491.   The personnel with specialized professional training in psychology and behavioral owed an independent duty of care to foreseeable users of the systems they designed, that is the minor users on whom they deliberately employed operant conditioning techniques without proper warning or informed consent.

492.   They breached this duty by designing addiction-generating product features without adequate ethical review, child safety safeguards, informed consent, or harm-prevention protocols.

493.   These breaches were committed within the scope of their employment and engagement as they are the acts they were engaged to perform, occurred within authorized time and space, in the service of the Defendants, and were affirmatively directed, measured, and rewarded by Defendants.

494. By virtue of the employment and/or agency relationship Defendants are vicariously responsible for the personnel's negligence and the resulting foreseeable harm as if the Defendants had committed these torts directly.

495. As a direct and proximate result of the personnel's breaches, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

496. The breaches have directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

497. The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

498. Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' defective products, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

      a. Student achievement and performance;
      b. Chronic absenteeism;

      c.  College/career/workforce Readiness;

      d.  Community trust and confidence;

      e.  School-student relationship;

      f.  Parent-school relationship;

      g.  School environment.

499.   The direct and proximate result of Defendants' negligent training also includes foreseeable economic harms for Plaintiff, including but not limited to, the need to:

      a.  Expend, divert and increase human and financial resources to provide additional mental health resources to minors;

      b.  Hire additional counselors, staff, and personnel for mental health and disciplinary services;

      c.  Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;

      d.  Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;

      e.  Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;

      f.  Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;

      g.  Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;

      h.  Expend, divert, and increase resources for modifications to mental health curriculum;

      i.  Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

      j.  Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

      k.  Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

      l.  Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m. Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n. Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o. Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and;

p. Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

500. Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance,

501. As a direct and proximate result of the Defendants' negligent training, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

502. Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

503. Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and

warnings in products targeted at the users most vulnerable to the dangerous effects – children – manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

## COUNT EIGHT: NEGLIGENT DESIGN
### (Against All Defendants)

504.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

505.   At all relevant times, each Defendant was engaged in the business of designing, formulating, producing, creating, making, constructing, assembling, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, and/or otherwise distributing their respective video game Products used by students within Plaintiff's District.

506.   If, alternatively, Defendant's respective Video Game Products are not "Products" for the purposes of OPLA, then Defendants are liable under the of negligent design.

507.   Each of Defendants' respective video game products used by students within Plaintiff's District were defective designed and unreasonably dangerous due to operant conditioning which assured video game addiction would occur in users, including minors, and the lack of necessary safeguards.

508.   None of the defects in Defendants' Video Game Products cause injury due to any particular content or expression within any of the games. Instead, the defects and injuries arise from the Defendants' own content.

509.   The video game Products that each Defendant placed into the stream of commerce were defectively designed at the time they left each Defendants' control. The Products were

designed to cause addictive and compulsive use, including by minors and young adults and lacked necessary safeguards. The Products are not reasonably fit, suitable, or safe for their intended purpose of playing a game without operant conditioning.

510.   The defects in each Defendant's respective designs were present in the Products when the Products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner. Each Defendant's respective Products were expected to and did reach students within Plaintiff's District without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

511.   Defendant Roblox's Video Game Products were defective as a result of the intentional implementation of content-agnostic design features designed to drive continuous play, particularly children, through the utilization of operant conditioning techniques in the absence of adequate safeguards. The defects include, but are not limited to, the following:

     a.   Variable Ratio Reinforcement Architecture (VRRA): Roblox's core reward delivery system delivers in-game rewards such as items, badges, Robux bonuses or experience points, at statistically unpredictable intervals and is embedded in Roblox's foundational architecture by Roblox – separate from any in-game content;

     b.   Loot Box and Mystery Reward Container System (loot boxes): Also embedded in Roblox's foundational architecture, Roblox's loot box and mystery reward container mechanics employ slot machine mechanics to deliver randomized rewards of variable value upon payment of Robux, Roblox's in-game currency maintained by Roblox across all experiences.

     c.   Artificial Scarcity and Time-Limited Availability Design: Also called "FOMO Architecture" for its reliance on the fear of missing out, Roblox's content-agnostic and intentional creation of scarcity embedded in its foundational architecture exploits the psychological mechanism of loss aversion to periodically makes items, events and rewards available only during short, non-renewable windows and uses

various countdown timers, urgency notifications, and "last chance" prompts;

d. Daily Log-In Streak and Penalty Architecture: Roblox's content and experience-agnostic streak mechanics embedded in its foundational architecture, including daily logins and streak-break penalties, creates a negative reinforcement loop that operates continuously and independently of positive reinforcement mechanisms;

e. Push Notification Re-Engagement System: Roblox's embedded notification architecture is designed to deliver targeted push notifications during periods of lapsed user engagement, agnostic to and independent of any experience content, to interrupt user's other activities, including sleep and school.

f. Virtual Currency Obfuscation: The embedded architecture of Roblox's Robux virtual currency and in-game purchasing system that funnels all transactions through Robux rather than real dollars severs a user's awareness of the connection between in-game spending and real-dollar cost, regardless of any content being purchased with those Robux.

512.  Defendant Microsoft and Mojang's Video Game Products were defective as a result of the intentional implementation of content-agnostic design features designed to drive continuous play, particularly children, through the utilization of operant conditioning techniques in the absence of adequate safeguards. The defects include, but are not limited to, the following:

a. Minecraft Variable Reward Architecture: Minecraft's embedded architecture of content-agnostic loot mechanics, achievement unlock sequences, and mob-drop randomization employ variable ratio reinforcement schedules like those used by slot machines to deliver items at unpredictable intervals.

b. Virtual Currency Obfuscation: The embedded architecture of Minecraft's Minecoins virtual currency and in-game purchasing system that funnels all transactions through Minecoins rather than real dollars severs a user's awareness of the connection between in-game spending and real-dollar cost, regardless of any content being purchased with those Robux.

c. Xbox's Cross-Platform Achievement System: Microsoft's Xbox achievement systems applies to all games played through the Xbox systems drives continuous engagement with the Xbox system itself rather than any particular game using public points, achievement

badges, and social recognition rewards at variable intervals across all games in the Xbox ecosystem.

d.   Minecraft: Education Edition: Microsoft's school-directed version of Minecraft contains the same product defects common to Minecraft, but in a package specifically targeted for classroom and/or educational deployment to school-age children without any of the necessary safeguards.

513.   Defendant's Video Game Products, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as user-imposed time restrictions on gameplay, each Product's design lacking proper minor age verification, and each Product failing to operate as a reasonable user would expect.

514.   Students within Plaintiff's District used Defendants' Video Game Products, including Roblox, Minecraft and Xbox system, in an intended and reasonably foreseeable manner, and the Products were not materially altered prior to their use.

515.   Each Defendant owed a duty to not only the direct users of its Video Game Products, but to all foreseeable victims of harm caused by the Products' defects. Plaintiff is just such a foreseeable victim.

516.   The nature and magnitude of the harm and risks of harm to students in Plaintiff's District and Plaintiff itself were foreseeable because Defendants specifically targeted its products to school-aged children, including students within Plaintiff's District, for both general and educational use. Those children used the Video Game Products for their intended and foreseeable uses, including compulsive and continuous play.

517.   As a clinically significant behavioral addiction recognized by the WHO with an ICD-11 code and the APA in the DSM-5 affecting approximately 1.5% of the estimated 50 million child gamers in the United state, both the risk of and magnitude of the harm associated with Internet Gaming Disorder is foreseeable.

518.   These child gamers, along with their Parents and Plaintiff School District had no awareness of, or capacity to appreciate the operant conditioning mechanisms intentionally embedded in Defendants' Video Game Products due to the Defendants' failure to properly warn of or disclose the risk of Video Game Addition from operant conditioning created by Defendants' engagement of mental health professionals to drive continuous play in pursuit of ever-increasing profits. The psychological mechanisms underlying the addiction risk are not within the ordinary knowledge of parents, educators or children and the pertinent facts were withheld by Defendants.

519.   Similarly, the defects in Defendants' Video Game Products causing these harms to students and to Plaintiff was not only likely and foreseeable because of the behavioral conditioning effects of the games but is in fact the intended and monitored effect of Defendants' designs. Defendants should recognize these risks specifically because they are the intended result of their design and development, as would be recognized by a reasonable manufacturer using the knowledge the Defendants should, and in fact did, possess.

520.   Defendants' designs do not conform to any of the applicable and/or emerging standards related to child-directed digital platforms, including the industry standards, ESRB's evolving interactive elements disclosure standards, the FTC's guidance on child-directed marketing, or COPPA Safe Harbor program guidelines.

521.   Because of these intentional design choices by Defendants, the respective Video Game Products are more dangerous than a reasonably prudent consumer would expect when played in the intended manner, as an ordinary and reasonably prudent consumer purchasing a game for their minor child would not expect that a product marketed as an educational tool or "safe, family-friendly" product would conceal operant conditioning systems specifically designed to create behavioral addiction in children. The inconsistency and discrepancies between representations of the product as safe and educational and the employed addiction-generating behavioral science architecture results in a design that is more dangerous than a reasonably prudent consumer would expect.

522.   Reasonable users of Defendants' Products would not expect, and Plaintiff did not expect, that said Products would pose risks of severe video game addiction and the corresponding sequelae of physical and psychological injury, including but not limited to low self-esteem, depression, anxiety, chronic pain, social isolation, social and emotional behavior issues.

523.   Reasonable users of Defendants' Products would not expect that Defendants would conceal the operant conditioning, risks of video game addiction, and sequalae of that addiction, but Defendants nevertheless chose to place their Products into the stream of commerce while knowing of both the concealment and risk of harm.

524.   Each Defendant knew or, by the exercise of reasonable care, should have known that users, including students within Plaintiff's District, would use the Products without anyone inspecting the Products for addictive or other dangerous features.

525.   The defects of each of the Defendants' respective Video Game Products are each a substantial factor in causing injuries to students in Plaintiff's District as well as the resulting injuries to Plaintiff itself.

526. At the time each Defendant's Products were designed, developed, distributed to Plaintiff, and played, safer alternative designs existed that were entirely feasible, both technically and economically, and any benefits of the specific addiction-generating design features in Defendants' products have, at best, de minimis legitimate benefits that could not be achieved through non-defective alternative designs, including but not limited to positive reinforcement systems that do not carry the risk of addiction.

527. For example, the defective addiction-generating behavior modification systems are not necessary to provide entertainment value within the products, as that can be accomplished during transparent, fixed-ratio reward systems without variable ratio conditioning. The core game utility of Roblox, Minecraft and the Xbox system do not depend on these addictive features that are merely superimposed on top of the core gaming utility for the specific purpose of generating compulsive engagement.

528. Each Defendant could have utilized cost effective, reasonably feasible alternative designs that eliminated or mitigated the harm caused by their respective Products without impairing the product's utility to users by implementing elements that include, but are not limited to:

   a. Warnings of the use of operant conditioning behavior modification systems;
   b. Lack of informed consent to operant conditioning;
   c. Robust age verification;
   d. Effective parental controls;
   e. The removal of barriers to the enactment of parental controls;
   f. Warnings of health effects of use and extended use upon sign-up;
   g. Opt-in restrictions to the length and frequency of sessions;
   h. Self-limiting tools, including but not limited to session time notifications, warnings, or reports.
   i. Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);
   j. Self-imposed limits for microtransactions; and
   k. Others as set forth herein.

135

529.   Examples of practical and technically feasible alternative design elements that would have prevented the harm to Plaintiff's students and therefore Plaintiff include, but are not limited to:

    a.   Fixed-ratio deterministic reward systems: Currently used in other competing platforms like Steam and Nintendo, fixed ratio reward systems deliver a specific, disclosed reward for each specified unit of gameplay and are an alternative to variable ratio loot box mechanics;

    b.   Hard daily session limits for minor accounts: To limit the exposure to operant conditioning behavior modification systems, Defendants could have implemented effective content-agnostic hard daily session time limits for accounts positively identified as belonging to minor users, as has been implemented in other programs like Apple's Screen Time or Google's Family Link;

    c.   Real-Dollar Price Display: By displaying real-dollar equivalents alongside virtual currency prices, Defendants could have preserved user's appreciation of the real-dollar value and the virtual currency functionality while eliminating the payment decoupling effect in their embedded architecture.

    d.   Notification Restrictions: Defendants could have implemented hard technical restrictions on the timing of push notifications and avoided, for example, disrupting sleep or school hours;

    e.   Eliminated Loss-Aversion Streak Penalty Architecture: Defendants could have preserved daily engagement incentive programs, such as streak bonuses, while eliminating penalties for breaking those streaks, thereby using positive reinforcement without the negative reinforcement that compels continuous and compulsive gameplay;

    f.   Robust Age-Differentiated Architecture: Defendants could have implemented technically robust age-verification at account creation, including parental consent verification for minors, and applied a product architecture for minors without the addiction-generating operant conditioning features.

530.   Accordingly, the defects in Defendants' Video Game Products are not the result of an inherent characteristic of the products, and instead could be eliminated without substantially compromising the products' usefulness or desirability.

531. Instead, each Defendant designed their respective Products to aggressively addict users with operant conditioning aimed to increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

532. Each Defendant could have completely avoided the harm by not utilizing operant conditioning in game design, provided proper game time tracking and a design to limit game play while still providing an optimal gaming experience.

533. At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

534. As a direct and proximate result of the defects in Defendants' Video Game Products, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

535. Defendants' defective Video Game Products have directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

536. The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

537. Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' defective products, Plaintiff suffers institutional harms that are not economic losses, including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

      a. Student achievement and performance;
      b. Chronic absenteeism;
      c. College/career/workforce Readiness;
      d. Community trust and confidence;
      e. School-student relationship;
      f. Parent-school relationship;
      g. School environment.

538. The direct and proximate result of the defective aspects of Defendants' products also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

      a. Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
      b. Hire additional counselors, staff, and personnel for mental health and disciplinary services;
      c. Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;
      d. Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;
      e. Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;
      f. Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;
      g. Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;
      h. Expend, divert, and increase resources for modifications to mental health curriculum;

    i. Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

    j. Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

    k. Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

    l. Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

    m. Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

    n. Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

    o. Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

    p. Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

539. Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance,

540. As a direct and proximate result of each Defendant's defective products, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which

caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

541.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction of operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

542.   Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

543.   In addition to the compensatory and punitive damages sought above, Plaintiff seeks equitable and injunctive relief ancillary to its design-defect claims that is narrowly tailored to the design defects identified herein. Such injunctive relief is necessary as monetary damages alone are insufficient to prevent the ongoing and future harms to students in Plaintiff's District and Plaintiff itself as the direct and proximate result of each of the Defendants' defective designs.

544.   Plaintiff specifically requests that the Court enter an order requiring each of the Defendants, at its own cost, to correct the content-agnostic design defects in their respective Video Game Products as they relate to users under the age of 18, including but not limited to:

> a.   Implementation of robust age verification and age-gated architecture: Defendants shall design, implement and maintain a commercially reasonably age-verification system for all new and existing accounts that reasonably and effectively distinguishes users under 18 and applies

140

a differentiated "minor-safe" architecture to all minor accounts that, at a minimum, disables or substantially modifies the addiction-generating design features identified in this Complaint, including but not limited to variable-ratio loot mechanics, streak-penalty systems, artificial scarcity/FOMO events, and cross-platform compulsion mechanics for such minor-associated accounts;

b. Implementation of hard session time limits and curfews for minors: For positively associated minor accounts, Defendants shall implement hard daily session-time limits calibrated to accepted pediatric screen-time guidance, and hard "curfew" windows during which minor-associated accounts cannot initiate or continue gaming sessions (e.g. overnight and school hours) without affirmative parental/guardian overrides through a verified parental control portal or mechanism'

c. Correction of notification architecture: For positively minor-associated accounts, Defendants shall redesign their embedded and content-agnostic notification architecture to eliminate push notifications during school or overnight hours absent a verified parent opt-in;

d. Reform of virtual-currency architecture: For positively minor-associated accounts, Defendants shall redesign their embedded and content-agnostic virtual currency system to eliminate the intentional decoupling of in-game spending from real-dollar cost by displaying the real-dollar equivalent of every virtual currency price at the point of purchase and disabling or strictly limiting "one-click" repeat-purchase flows for minors.

545.   Plaintiff further respectfully requests that the injunction require Defendants to submit to court-supervised monitoring for a reasonable period of time during which Defendants must certify compliance with the ordered design changes and refrain from deploying new features materially similar in function to the enjoined design mechanisms without advance notice to Plaintiff and the Court.

## COUNT NINE: NEGLIGENT FAILURE TO WARN
### (Against All Defendants)

546.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

547.  At all relevant times, each Defendant was engaged in the business of designing, formulating, producing, creating, making, constructing, assembling, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, and/or otherwise distributing their respective video game Products used by students within Plaintiff's District.

548.  If, alternatively, Defendant's respective Video Game Products are not "Products" for the purposes of OPLA, then Defendants are liable under the of negligent failure to warn.

549.  Defendants knew that their respective Products concealed the built-in operant conditioning, rendering the games unreasonably dangerous, harmful, capable of causing—and in fact were designed to cause—compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

550.  Each of Defendants' respective video game products used by students within Plaintiff's District were defective designed and unreasonably dangerous due to operant conditioning which assured video game addiction would occur in users, including minors, and the lack of necessary safeguards.

551.  Each Defendant knew, or in the exercise of reasonable care should have known, of the specific risk of Internet Gaming Disorder in minor users associated with the deliberate deployment of content-agnostic addiction-generating operant conditioning features in their respective Video Game Products, even when used by students in Plaintiff's District in a reasonably foreseeable manner.

552.  Defendants' knew of their intentional use of operant conditioning within their respective Video Game Products, and likewise knew or should have known about the harm that posed on the basis of multiple bases of information, including but not limited to:

    a. Internal analytics: The function of many of the operant conditioning features required tracking and analysis of user behavior for execution, and such tracking would have also revealed the disordered behavior of users, including students in Plaintiff's District;

    b. Employed expert knowledge: The expertise and knowledge of the psychologists and other mental health professionals engaged by Defendants would have also recognized the disordered behavior of users, including students in Plaintiff's District, and the specific clinical risks posed by defective embedded architecture like variable ratio reward architecture; and

    c. Published scientific knowledge: Although not generally known by the public, like Plaintiff, peer-reviewed research establishing the addiction-generating properties of the operant conditioning mechanisms used by Defendants was available to the Defendants as early as 2012.

553.   Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of their respective Video Game Products, nor have been capable of knowing that operant conditioning was being used on players in the games.

554.   At the time Defendants' Products left Defendants' control, they did not include—nor have they ever included—warnings that the Products pose an unreasonable risk of harm to users, particularly minors. The inclusion of operant conditioning to increase continuous gameplay was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

555.  Defendants failed to provide warning or instructions that a manufacturer exercising reasonable care would have provided, through failures including but not limited to:

a. No warning of operant conditioning: No user-facing product documentation, including but not limited to app store listing, load screens, terms of service or in-game interfaces, contained any warning the Defendants' systems create a risk of gaming disorder in minor or neurodivergent gamers like students in Plaintiff's District; the use of operant conditioning behavior modification systems and/or addiction-generating behavior mechanisms in the Defendants' respective Video Game Products;

b. No warning of psychologist involvement: No user-facing product documentation, including but not limited to app store listing, load screens, terms of service or in-game interfaces, contained any warning that Defendant's engaged the assistance of behavioral psychology professionals to intentionally design the games to drive continuous and compulsive play;

c. No warning of addiction risk in product documentation: No user-facing product documentation, including but not limited to app store listing, load screens, terms of service or in-game interfaces, contained any warning that the Defendants' systems create a risk of gaming disorder in minor or neurodivergent gamers like students in Plaintiff's District;

d. No warning of addiction risk in product documentation: No user-facing product documentation, including but not limited to app store listing, load screens, terms of service or in-game interfaces, contained any warning of the types of symptoms or criteria associated with Internet Gaming Disorder;

e. No disruptive engagement usage warning: No user-facing product documentation, including but not limited to app store listing, load screens, terms of service or in-game interfaces, contained any warning that Defendants' respective Video Game Products utilized disruptive notifications to compel engagement during periods of decreased use, such as during school or sleep time;

f. No minor-specific warnings: No user-facing product documentation, including but not limited to app store listing, load screens, terms of service or in-game interfaces, contained any warning that minors and neurodivergent users were more likely to suffer harmful effects, including the development of Internet Gaming Disorder, from the behavior modification systems used by Defendants in their respective products.

556. Each Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

a. Warnings of the use of operant conditioning behavior modification systems;

b. lack of informed consent to operant conditioning in the games;

c. failing to warn users, parents and schools that operant conditioning was used in the games;

d. failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

e. failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

f. failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

g. failed to issue warnings to consumers regarding the dangerous risks of the Products even after the sale and/or download of their Products; and

h. representing that the Products were and are safe for use, when in fact, Defendants knew or should have known that their Products were designed to cause minors to engage in excessive use until they developed an addiction or disordered compulsion to use the Products.

557. Moreover, each Defendant's non-feasance, failure to act, and omissions in the development, set up, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective Products rendered the product unreasonably dangerous. Those failures include but are not limited to:

a. Incorporating operant conditioning into the infrastructure of game play to reward continuous video game play;

b. Designing the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third parties;

c. Failing to implement effective parental controls;

d. Failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of Products, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

e. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game

downloadable Products and upgrades and in-game purchases and/or microtransactions; and

f.  Failing to implement reasonably available means to allow users or their parents to limit or deter use of Products by minors during ordinary times for school or sleep.

558.  Each Defendant's failure to adequately warn about its defective Product created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Product.

559.  Furthermore, Defendants each failed to provide adequate post-marketing warnings throughout their respective Video Game Product's commercial life, including but not limited to times such as upon the World Health Organization's publication of the ICD-11 Internet Gaming Disorder classification in 2018 and effective adoption in 2022.

560.  Each Defendant made product updates and released new versions of their Video Game Products without implementing any addiction risk warning in the updated products.

561.  At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

562.  A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff of the dangers of its Product.

563.  Reasonable users of Defendants' Products would not expect, and Plaintiff did not expect, that said Products would pose risks of severe video game addiction and the corresponding sequelae of physical and psychological injury, including but not limited to low self-esteem, depression, anxiety, chronic pain, social isolation, social and emotional behavior issues.

564.  Reasonable users of Defendants' Products would not expect that Defendants would conceal the operant conditioning, risks of video game addiction, and sequalae of that addiction, but

Defendants nevertheless chose to place their Products into the stream of commerce while knowing of both the concealment and risk of harm.

565. Each Defendant knew or, by the exercise of reasonable care, should have known that users, including students within Plaintiff's District, would use the Products without anyone inspecting the Products for addictive or other dangerous features.

566. The defects of each of the Defendants' respective Video Game Products, and the lack of warning thereof, are each a substantial factor in causing injuries to students in Plaintiff's District as well as the resulting injuries to Plaintiff itself.

567. The risk of addiction and resulting harms is not an open and obvious risk of the Defendant's respective Video Game Products, not is it a matter of common knowledge among the relevant consumer population, such as the parents of the children in Plaintiff's District. To the extent Defendants treated the specific behavioral science mechanisms used in their products as proprietary, trade secrets or other confidential information, the public was prevented from knowing of their presence and corresponding risk of harm.

568. Had Defendants' warned users, like students in Plaintiff's District, of the risks of their products, those that would not used or discontinued use of the Video Game Products would have reduced the harm and burden to Plaintiff, thereby mitigating or eliminating the harm and loss to Plaintiff. Furthermore, proper warning would have allowed students' families and Plaintiff to take proactive steps to reduce the harm to itself, including but not limited to implementation of correcting programing and resource allocation prior to the full development of the harm. Had Plaintiff been aware that the Products could cause significant harm, including an increased risk of suicide and severe mental health effects, it would not have used or continued to use each Defendant's respective Product.

569.   The addictive nature of each Defendant's defective Product and failure to warn about said Products actually and proximately caused Plaintiff's video game addiction, compulsiveness, and resulting physical, psychological, emotional and economic harm.

570.   As a direct and proximate result of the defects in Defendants' Video Game Products, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

571.   Defendants' defective Video Game Products have directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

572.   The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

573.   Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' defective products, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

148

     a.   Student achievement and performance;
     b.   Chronic absenteeism;
     c.   College/career/workforce Readiness;
     d.   Community trust and confidence;
     e.   School-student relationship;
     f.   Parent-school relationship;
     g.   School environment.

574.   The direct and proximate result of the defective aspects of Defendants' products also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

     a.   Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
     b.   Hire additional counselors, staff, and personnel for mental health and disciplinary services;
     c.   Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;
     d.   Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;
     e.   Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;
     f.   Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;
     g.   Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;
     h.   Expend, divert, and increase resources for modifications to mental health curriculum;
     i.   Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;
     j.   Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;
     k.   Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;
     l.   Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g.

reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m. Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n. Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o. Expend, divert, and increase resources to account for the strain placed on schools' local

p. community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

q. Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

575.  Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance,

576.  Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

577.  Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game

Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

578. In addition to the compensatory and punitive damages sought above, Plaintiff seeks equitable and injunctive relief requiring adequate warnings and disclosures that a reasonably careful manufacturer would now provide, given Defendants' knowledge of the risks alleged in this count. Such injunctive relief is necessary as monetary damages alone are insufficient to prevent the ongoing and future harms to students in Plaintiff's District and Plaintiff itself as the direct and proximate result of each of the Defendants' failure to provide adequate warnings or disclosures.

579. Plaintiff therefore respectfully requests that the Court order Defendants to:

a. Provide clear addiction-risk warnings at onboarding and login: Defendant shall add conspicuous, plain language warning at account creation, login screens and core menus for all positively minor-associated accounts and in all parent-facing documentation that (a) explain that the Defendants' respective Video Game Products employ behavioral conditioning techniques and variable-ratio reward systems; (b) that such systems are associated with a clinically-recognized condition called Gaming Disorder or Internet Gaming Disorder, and (c) describe in terms understandable to laypersons the specific signs and symptoms of gaming disorder in children;

b. Disclose operant conditioning behavioral design architecture: Defendants shall add disclosures parent-facing materials and online information centers that explain in terms understandable to laypersons the presence and function of (a) variable-ratio loot/reward systems; (b) streak and return-day mechanics; (c) time-limited event and artificial scarcity systems; (d) disruptive notification timing to maximize re-engagement; and (e) virtual currency decoupling mechanism;

c. Warn about minor-specific vulnerability: For positively minor-associated accounts, Defendants shall include explicit warnings at account creation, login screens and core menus for all such accounts and in all parent-facing documentation an explicit warning that children and adolescents are more vulnerable than adults to conditioning and

151

addictions from the types of behavioral modification systems described herein and that parents should closely monitor and limit use by minors;

d. Warn about school and overnight-hours risks: For all positively minor-associated accounts, Defendants shall include explicit warnings at account creation, login screens and core menus for all such accounts and in all parent-facing documentation explicit and prominent warning that excessive use and use during school and overnight hours can impair learning, attention, and behavior in school, and instruct parents on how to configure settings to limit or prevent such use.

580. Plaintiff also respectfully requests an order requiring Defendants to issue corrective communications, such as email notices, in-platform messages, and updates to all app-store listing and marketing sites, informing users, parents and the public of the newly required warning and disclosures along with the availability of enhanced parental control features.

**COUNT EIGHT: BREACH OF WARRANTY**
**Breach of Implied Warranty in Tort / Strict Product Liability**

581. Plaintiff realleges and incorporates by reference the factual allegations contained above as if fully set forth herein.

582. At all relevant times herein, Defendants have been engaged in the business of designing, developing, operating, managing, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, selling, and otherwise distributing their respective video game products and placing them into the stream of commerce.

583. If, alternatively, Defendant's respective Video Game Products are not "Products" for the purposes of OPLA, then Defendants are liable under a breach of implied warranty under tort.

584. Each of Defendants' Products were defectively designed, and are unreasonably dangerous, due to the incorporation of operant conditioning and a corresponding lack of sufficient safeguards that, in concert, cause excessive video game use and video game addiction among minors, including students who attend Plaintiff's schools. More particularly, the lack of

152

sufficient safeguards included, but is not limited to, Defendants' failure to include warnings about the risk of addiction and Defendants' failure to include in their game designs user-imposed time restrictions on gameplay and proper minor age verification.

585.    Defendants' Products did not perform as safely as an ordinary consumer would have expected, and are more dangerous than other products, because they were intentionally designed to be addictive, specifically to minors, which caused myriad physical and psychological injuries and harm to minors, including students who attend Plaintiff's schools.

586.    In addition, Defendants' Products are defective and unreasonably dangerous because the incorporation of operant conditioning and a corresponding lack of sufficient safeguards, which were intended to encourage excessive video game use leading to video game addiction, was not necessary to the intended utility of the Products and instead posed a risk of harm to minors that was known to Defendants.

587.    Moreover, Defendants failed to warn Plaintiff or the general public that Defendants included operant conditioning and a corresponding lack of sufficient safeguards in their Products' game designs, or of the danger that those design components would cause excessive video game use and video game addiction among minors, including students who attend Plaintiff's schools. As a result, Defendants' Products are defective and unreasonably dangerous because they include no warning, an inadequate warning, no instruction, or inadequate instruction of the risks the Products pose to minors and to Plaintiff that accompany the foreseeable and intended use of the Products.

588.    Each Defendant knew, or in the exercise of reasonable care should have known, that users, including Plaintiff and the general public, would use the Products without inspecting the Products for addictive or other dangerous features.

589.   Each Defendant knew, or in the exercise of reasonable care should have known, that the Products were defective and unreasonably dangerous as further described herein, and that minors were likely to suffer physical and psychological injury as a result of their use of the Products.

590.   Each Defendant knew, or in the exercise of reasonable care should have known, that excessive use of the Products would contribute substantially to the youth mental health crisis that Plaintiff has been forced to address in its schools as more fully described herein.

591.   Defendants' burden to inform Plaintiff and the general public that their Products included operant conditioning, to permit informed decisions about their use of the Products and to obtain informed consent to the use of operant conditioning behavior modification systems, is not high and, furthermore, is mandated for the licensed psychologists and psychiatrists who Defendants employed.

592.   Defendants' Products were expected to reach consumers, and in fact did reach consumers, without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce. As a result, Defendants' Products were not materially altered prior to their use.

593.   Accordingly, these defects, both in design and in the failure to warn, were present in the Products when they left Defendants' hands, rendering the Products unreasonably dangerous at the time the Products were released to Plaintiff and the general public in the stream of commerce to be used in their intended and foreseeable manner.

594.   Minors used Defendants' Products in an intended and reasonably foreseeable manner.

595.   Reasonable users of Defendants' Products would not expect, and Plaintiff did not expect, that Defendants would conceal the application of operant conditioning in their Products, the

enhanced risks of video game addiction caused by their Products, and the sequelae of video game addiction, but Defendants nevertheless released their Products into the stream of commerce while knowing of both the concealment and the risk of injury.

596.   Reasonable users of Defendants' Products would not expect, and Plaintiff did not expect, that the Products would present enhanced risks of video game addiction and the resulting sequelae of physical and psychological injury including, but not limited to, anxiety, depression, pain, functional neurological symptoms, and social isolation.

597.   As a direct and proximate result of the defects in Defendants' Products, minors developed video game addiction and the sequelae of that addiction, leading to the youth mental health crisis which Plaintiff has been forced to address in its schools and as further described in this Complaint.

598.   Defendants could have completely avoided the harm they caused Plaintiff by designing the Products without operant conditioning, providing proper game-time tracking, and including reasonable game-time limitations --- all without compromising an optimal gaming experience.

599.   At the time Defendants designed their Products and released their Products into the stream of commerce, safer alternative designs were available that were both cost effective and reasonably feasible. For example, alternative designs included, but are not limited to:

    a.   Warnings of the use of operant conditioning behavior modification systems;
    b.   Measures to obtain informed consent to operant conditioning;
    c.   Robust age verification;
    d.   Effective parental controls;
    e.   The removal of barriers to the enhancement of parental controls;
    f.   Warnings of health effects of use and extended use upon signing up to use the Products;
    g.   Opt-in restrictions to the length and frequency of sessions;
    h.   Self-limiting tools including, but not limited to, session time notifications, warnings, or reports;

155

      i.   Tools to restrict and/or block usage during certain times of the day (such as during normal school hours or late at night); and

      j.   Self-imposed limits for microtransactions.

600.   As a direct and proximate result of Defendants' negligent conduct, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

601.   Defendants' negligent conduct, has directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

602.   The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

603.   Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' negligent conduct, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

      a.   Student achievement and performance;

      b.   Chronic absenteeism;

    c.  College/career/workforce readiness;

    d.  Community trust and confidence;

    e.  School-student relationship;

    f.  Parent-school relationship;

    g.  School environment.

604.   The direct and proximate result of the Defendants' breach of warranty also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

    a.  Expend, divert and increase human and financial resources to provide additional mental health resources to minors;

    b.  Hire additional counselors, staff, and personnel for mental health and disciplinary services;

    c.  Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;

    d.  Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;

    e.  Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;

    f.  Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;

    g.  Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;

    h.  Expend, divert, and increase resources for modifications to mental health curriculum;

    i.  Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

    j.  Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

    k.  Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

    l.  Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m. Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n. Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o. Expend, divert, and increase resources to account for the strain placed on schools' local

p. community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

q. Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

605. Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance.

606. As a direct and proximate result of each Defendant's breach of warranty, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

607. Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

608. Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction

operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

## COUNT NINE: FRAUDULENT CONCEALMENT

609. **Plaintiff** realleges and incorporates by reference the factual allegations contained above as if fully set forth herein.

610. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which is unreasonably dangerous due to the concealment of operant conditioning in their video game designs with the behavior goal of continuous video game play, the resulting increased risk of video game addiction, and the lack of warnings about the increased risk of video game addiction.

611. As detailed herein, Defendants knew about the conditions of their respective Products and that the Products posed serious health and psychological risks to users, particularly minors.

612. Each Defendant designed their respective product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

613. Each Defendant knew its respective Products posed risks of harm to users, particularly youth. These risks were known and knowable considering each Defendant's own internal information and knowledge regarding its Product at the time of the Product's development,

design, marketing, promotion, advertising, and distribution to Plaintiff. The inclusion of operant conditioning to increase continuous gameplay was concealed from Plaintiff, video game users, parents, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized — thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems — is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

614.   Each Defendant knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

615.   At all relevant times herein, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

616.   Each Defendant induced, promoted, and otherwise facilitated the use of operant conditioning behavior modification systems on minors without adequate warning or informed consent and included, promoted, and otherwise facilitated psychological professionals to violate their applicable standards of care including, but not limited to, the APA Code of Conduct, in the development and promotion of Defendants' Products.

617.   Each Defendant actively worked to suppress diagnosis and treatment of video game addiction, contrary to its true occurrence.

618.   The use of operant conditioning and intentional behavioral modification in Defendants' respective Video Game Products is not readily observable or discoverable through a reasonable inspection by either the families of students in Plaintiff's District playing the

games or by Plaintiff. Defendants' superior knowledge of that concealed, along with any partial disclosures that would have resulted from the game play that rendered the disclosed information misleading created an affirmative duty to speak for each Defendant.

619.   Each Defendant was required to have disclosed the harmful conditions of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

620.   Each Defendant knowingly and intentionally concealed the material fact of the use of operant conditioning addiction-generating  risk of addiction posed by their respective Video Game Products misrepresented that their respective Products were safe for use, and safe as educational tools, to further entice users to continue engaging with their respective Products, including Plaintiff, while simultaneously knowing that their respective Products each caused addiction and compulsive use.

621.   By way of example, and not of limitation, Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their]

games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone." Similarly, Defendant Roblox claimed that its 2024 updates were implemented because "[s]afety is and always has been foundational to everything [it does] at Roblox" and added that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users." Roblox also asserted that it "built a platform with safety at the foundation[,]" that it "strive[s] to make [its] systems as safe as possible by default, especially for [its] youngest users[,]" and that its age recommendations for its Product are "grounded in child development research and informed by industry standards[.]"

622.  Each Defendant's statements about the safety of their respective Products were false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products was misleading and deceitful.

623.  Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their Products and to increase their profits.

624.  However, each Defendant knew that their respective Products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction as a diagnosable psychological condition. As a result, each Defendant knowingly made false statements about the safety of their respective Products.

625.   Each Defendant failed to disclose to users, including Plaintiff, that their Products are designed to create and sustain addiction.

626.   Each Defendant intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

627.   Each Defendant intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

628.   If each Defendant had not concealed, omitted, and misrepresented facts regarding the educational value and safety of their Products, and had Plaintiff been aware that the Products could cause significant harm such as increased risk of suicide, brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders --- each of which Plaintiff must address through increased social services provided in its schools ---  Plaintiff would not have allowed students in its schools to use or continue to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff, it would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

629.   Plaintiff was unaware of the dangerous and addictive nature of Defendants' Products. Plaintiff reasonably relied on each Defendant's representations that its respective Product was educational and safe for use, particularly for minors.

630.   Plaintiff reasonably relied on each Defendant's representations and did not know, nor have any way of knowing, about the misrepresentations of Defendants' Products.

631.   A reasonable party, including Plaintiff, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health and psychological risks

associated with the use of Defendants' Products – to be important when deciding whether to purchase, download, use, continue to use, or introduce those Products to its students. Thus, Plaintiff justifiably relied on each Defendant's misrepresentations that the Products were educational and safe when purchasing, downloading, using, continuing to use, and/or introducing downloadable game content to its students.

632.   Because of Plaintiff's reasonable reliance on each Defendant's representations, Plaintiff sustained damages.

633.   As a direct and proximate result of Defendants' fraudulent concealment, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

634.   Defendants' fraudulent concealment has directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

635.   The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

636.   Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' negligent conduct, Plaintiff

suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

      a.  Student achievement and performance;
      b.  Chronic absenteeism;
      c.  College/career/workforce readiness;
      d.  Community trust and confidence;
      e.  School-student relationship;
      f.  Parent-school relationship;
      g.  School environment.

637.  The direct and proximate result of the Defendants' negligent conduct also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

      a.  Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
      b.  Hire additional counselors, staff, and personnel for mental health and disciplinary services;
      c.  Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;
      d.  Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;
      e.  Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;
      f.  Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;
      g.  Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;
      h.  Expend, divert, and increase resources for modifications to mental health curriculum;
      i.  Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

j.  Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

k.  Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

l.  Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m.  Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n.  Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o.  Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

p.  Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

638.  Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance.

639.  As a direct and proximate result of each Defendant's fraudulent misrepresentation, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

640.   Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

641.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

## COUNT TEN: FRAUDULENT MISREPRESENTATION
### Fraudulent / Intentional Misrepresentation

642.   Plaintiff realleges and incorporates by reference the factual allegations contained above as if fully set forth herein.

643.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which is unreasonably dangerous due to the concealment of operant conditioning in their video game designs with the behavior goal of continuous video game play, the resulting increased risk of video game addiction, and the lack of warnings about the increased risk of video game addiction.

644.   As detailed herein, Defendants knew about the conditions of their respective Products and that the Products posed serious health and psychological risks to users, particularly minors.

167

645.   Each Defendant designed their respective product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

646.   Each Defendant knew its respective Products posed risks of harm to users, particularly youth. These risks were known and knowable considering each Defendant's own internal information and knowledge regarding its Product at the time of the Product's development, design, marketing, promotion, advertising, and distribution to Plaintiff. The inclusion of operant conditioning to increase continuous gameplay was concealed from Plaintiff, video game users, parents, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized — thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems — is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

647.   Each Defendant knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

648.   At all relevant times herein, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

649.   Each Defendant induced, promoted, and otherwise facilitated the use of operant conditioning behavior modification systems on minors without adequate warning or informed consent and included, promoted, and otherwise facilitated psychological professionals to

violate their applicable standards of care including, but not limited to, the APA Code of Conduct, in the development and promotion of Defendants' Products.

650.  Each Defendant actively worked to suppress diagnosis and treatment of video game addiction, contrary to its true occurrence.

651.  Each Defendant could have disclosed the harmful conditions of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

652.  Each Defendant knowingly and intentionally misrepresented that their respective Products were safe for use, and safe as educational tools, to further entice users to continue engaging with their respective Products, including Plaintiff, while simultaneously knowing that their respective Products each caused addiction and compulsive use.

653.  By way of example, and not of limitation, Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for

Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone." Similarly, Defendant Roblox claimed that its 2024 updates were implemented because "[s]afety is and always has been foundational to everything [it does] at Roblox" and added that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users." Roblox also asserted that it "built a platform with safety at the foundation[,]" that it "strive[s] to make [its] systems as safe as possible by default, especially for [its] youngest users[,]" and that its age recommendations for its Product are "grounded in child development research and informed by industry standards[.]"

654.  Each Defendant's statements about the safety of their respective Products were false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products was misleading and deceitful.

655.  Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their Products and to increase their profits.

656.  However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction as a diagnosable psychological condition. As a result, each Defendant knowingly made false statements about the safety of their respective Products.

657. Each Defendant failed to disclose to users, including Plaintiff, that their Products are designed to create and sustain addiction.

658. Each Defendant intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

659. Each Defendant intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

660. If each Defendant had not concealed, omitted, and misrepresented facts regarding the educational value and safety of their Products, and had Plaintiff been aware that the Products could cause significant harm such as increased risk of suicide, brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders --- each of which Plaintiff must address through increased social services provided in its schools --- Plaintiff would not have allowed students in its schools to use or continue to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff, it would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

661. Plaintiff was unaware of the dangerous and addictive nature of Defendants' Products. Plaintiff reasonably relied on each Defendant's representations that its respective Product was educational and safe for use, particularly for minors.

662. Plaintiff reasonably relied on each Defendant's representations and did not know, nor have any way of knowing, about the misrepresentations of Defendants' Products.

663. A reasonable party, including Plaintiff, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health and psychological risks

associated with the use of Defendants' Products – to be important when deciding whether to purchase, download, use, continue to use, or introduce those Products to its students. Thus, Plaintiff justifiably relied on each Defendant's misrepresentations that the Products were educational and safe when purchasing, downloading, using, continuing to use, and/or introducing downloadable game content to its students.

664.   Because of Plaintiff's reasonable reliance on each Defendant's representations, Plaintiff sustained damages.

665.   As a direct and proximate result of Defendants' negligent conduct, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

666.   Defendants' fraudulent misrepresentation has directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

667.   The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

668.   Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' negligent conduct, Plaintiff

suffers institutional harms that are not economic losses, including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

    a. Student achievement and performance;
    b. Chronic absenteeism;
    c. College/career/workforce readiness;
    d. Community trust and confidence;
    e. School-student relationship;
    f. Parent-school relationship;
    g. School environment.

669. The direct and proximate result of the Defendants' negligent conduct also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

    a. Expend, divert and increase human and financial resources to provide additional mental health resources to minors;
    b. Hire additional counselors, staff, and personnel for mental health and disciplinary services;
    c. Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;
    d. Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;
    e. Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;
    f. Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;
    g. Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;
    h. Expend, divert, and increase resources for modifications to mental health curriculum;
    i. Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

j. Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

k. Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

l. Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

m. Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

n. Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

o. Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

p. Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

670. Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance.

671. As a direct and proximate result of each Defendant's fraudulent misrepresentation, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

672.   Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

673.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children- manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

## COUNT ELEVEN: NEGLIGENT MISREPRESENTATION

674.   Plaintiff realleges and incorporates by reference the factual allegations contained above as if fully set forth herein.

675.   At all relevant times herein, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which is unreasonably dangerous due to the concealment of operant conditioning in their video game designs with the behavior goal of continuous video game play, the increased risk of video game addiction, and the lack of warnings about the increased risk of video game addiction.

676.   As detailed herein, Defendants knew about the harmful conditions of their respective Products and that the Products posed serious health and psychological risks to users, particularly minors.

677.   Each Defendant designed their respective product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

678.   Each Defendant knew of the risks associated with the use of their Products based on internal research and external studies known within the industry.

679.   At all relevant times herein, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

680.   Each Defendant induced, promoted, and otherwise facilitated the use of operant conditioning behavior modification systems on minors without adequate warning or informed consent and induced, promoted, and otherwise facilitated psychological professionals to violate their applicable standards of care including, but not limited to, the APA Code of Conduct, in the development and promotion of Defendants' Products.

681.   Each Defendant actively worked to suppress diagnosis and treatment of video game addiction, contrary to its true occurrence.

682.   Each Defendant could have disclosed the harmful conditions of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly minors. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

683.   Each Defendant misrepresented that their respective Products were safe for use general use, and safe as educational tools, to further entice users to continue engaging with their

Products, including Plaintiff, while simultaneously knowing that their respective Products each caused addiction and compulsive use.

684.  By way of example, and not of limitation, upon information and belief, Defendants Microsoft and Mojang represented that they will hold themselves accountable for making Minecraft as safe as possible for everyone,  that it is so important that their games are a safe and welcoming place for all players, that player safety is a priority for Mojang to ensure everyone feels safe, and that their community standards help [them] build a community that is open and safe for everyone. Similarly, upon information and belief, Defendant Roblox represented that its 2024 updates were implemented because safety is and always has been foundational to everything it does at Roblox and added that safety underpins everything we do at Roblox, particularly the safety of our youngest users. Roblox also represented that it built a platform with safety at the foundation, that it strives to make its systems as safe as possible by default, especially for its youngest users, and that its age recommendations for its Product are "grounded in child development research and informed by industry standards.

685.  Each Defendant's statements about the safety of their respective Products were false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products was misleading and deceitful.

686.  Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were educational and safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their Products and to increase their profits.

687. However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction as a diagnosable psychological condition. As a result, each Defendant recklessly made false statements about the safety of their respective Products.

688. Each Defendant failed to disclose to users, including Plaintiff, that their Products are designed to create and sustain addiction.

689. Each Defendant failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

690. Each Defendant failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

691. If each Defendant had not concealed, omitted, and misrepresented facts regarding the educational value and safety of their respective Products, and had Plaintiff been aware that the Products could cause significant harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, increased suicide risk, and behavioral addiction disorders --- each of which Plaintiff must address through increased social services provided in its schools --- Plaintiff would not have allowed students in its schools to use or continue to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff, it would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

692.   Plaintiff was unaware of the dangerous and addictive nature of Defendant's Products. Plaintiff reasonably relied on each Defendant's representations that its respective Product was educational and safe for use, particularly for minors.

693.   Plaintiff reasonably relied on Defendants' representations and did not know, nor have any way of knowing, about the misrepresentations of Defendants' Products.

694.   A reasonable party, including Plaintiff, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health and psychological risks associated with the use of Defendants' Products – to be important when deciding whether to purchase, download, use, continue to use, or introduce those Products to its students. Thus, Plaintiff justifiably relied on each Defendant's misrepresentations that the Products were educational and safe when purchasing, downloading, using, continuing to use, and/or introducing downloadable game content to its students.

695.   Because of Plaintiff's reasonable reliance on each Defendant's representations, Plaintiff sustained economic damages.

696.   As a direct and proximate result of Defendants' negligent conduct, students in Plaintiff's District, as well as Plaintiff, have suffered both non-economic and economic harm, all arising from the development of Internet Gaming Disorder and corresponding emotional, social and behavior issues among Plaintiff's students.

697.   Defendants' negligent conduct, has directly and proximately caused a student mental health crisis via Video Game Addiction in their pursuit of profit, including but not limited to, behavioral addiction, psychological injury, sleep deprivation, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage,

anger, physical outbursts, depression, low self-esteem, decreased school performance, and pain.

698.   The students' Video Game Addiction then, in turn, takes a corresponding toll on the staff and personnel that comprise Plaintiff School District, including but not limited to emotional distress, psychological and psychiatric injuries, physical injury from gaming-related behavioral dysregulation among the students, fatigue, and burnout.

699.   Furthermore, as the school district charged with providing the public education to residents within the district, as a direct and proximate cause of Defendants' negligent conduct, Plaintiff suffers institutional harms that are not economic losses,  including but not limited to the degradation of the Plaintiff's capacity to fulfill its constitutional, statutory, and public trust obligations to the community it serves. This occurs by, among other ways, negatively affecting aspects such as:

  a.   Student achievement and performance;
  b.   Chronic absenteeism;
  c.   College/career/workforce readiness;
  d.   Community trust and confidence;
  e.   School-student relationship;
  f.   Parent-school relationship;
  g.   School environment.

700.   The direct and proximate result of the Defendants' negligent conduct also include foreseeable economic harms for Plaintiff, including but not limited to, the need to:

701.   Expend, divert and increase human and financial resources to provide additional mental health resources to minors;

  a.   Hire additional counselors, staff, and personnel for mental health and disciplinary services;
  b.   Expend, divert, and increase resources, and increase staff to confiscate cell phones and other devices;

180

c.  Expend, divert and increase time and resources, and increase staff to communicate and engage with parents and guardians regarding students' attendance and youth mental health and behavioral issues;

d.  Expend and divert resources, and increase staff to address youth and student discipline issues caused by the mental health crisis;

e.  Expend and divert time and resources, and increase staff to route students and youth to counselors and mental health service providers;

f.  Expend and divert time and resources, and increase staff to train staff to identify students and youth exhibiting symptoms of mental health issues;

g.  Expend, divert, and increase resources for modifications to mental health curriculum;

h.  Expend, divert, and increase resources for creating education materials for youth, parents, and staff addressing Video Game Addiction and harm;

i.  Expend, divert, and increase resources to update student handbooks and policies to address use of Defendants' platforms;

j.  Expending, diverting, and increasing resources to purchase tools necessary to prevent or limit student's access to Defendants' Video Game Products;

k.  Expending, diverting, and increasing resources to develop new and revised teaching plans to address students' altered learning habits, e.g. reduced attention span and inability to communicate effectively due to excessive use of Defendants' Video Game Products;

l.  Expending, diverting, and increasing resources to provide additional learning supports to address students' declining achievement e.g. after school support as a result of the negative impact of Video Game Addiction on students' ability and capacity to learn;

m.  Expend, divert, and increase resources to investigate and prosecute crimes that result from Defendants' conduct and platforms and the youth mental health crisis;

n.  Expend, divert, and increase resources to account for the strain placed on schools' local community-based services such as outpatient therapy, behavioral health services, after school programs and other similar services and programming; and,

o.  Expend, divert, and increase resources to repair property damage as a result of Defendants' Defendants' conduct and addictive platforms targeted to attract and addict minors.

181

702.  Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation due to Defendants deliberate targeting of school-age children, during school and sleep hours especially and existing industry knowledge that Internet Gaming Disorder produces significant, measurable impairment in academic performance,

703.  As a direct and proximate result of each Defendant's negligent conduct, students in Plaintiff's District developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm to those students, the individuals comprising the District, and Plaintiff itself.

704.  Each Defendants' misconduct is a substantial factor in the harm suffered by the students in Plaintiff's District and Plaintiff.

705.  Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights. Furthermore, the intentional introduction operant conditioning behavior modification while withholding necessary safeguards and warnings in products targeted at the users most vulnerable to the dangerous effects – children-manifests a flagrant disregard of persons who might be harmed by respective Video Game Products, including Plaintiff. As a result, the imposition of punitive damages is warranted and Plaintiff seeks actual and punitive damages according to proof.

**COUNT TWELVE: PUNITIVE DAMAGES**

706.  Plaintiff realleges and incorporates by reference the factual allegations contained above as if fully set forth herein.

707.  Each Defendants' actions or omissions, as alleged in this Complaint, demonstrated malice or aggravated or egregious fraud, as described in R. C. 2315.21. More specifically, Defendants

willfully and consciously disregarded the safety and rights of others and engaged in intentional misrepresentations, with knowledge that such acts had a great probability of causing substantial harm, by implementing operant conditioning behavior modification systems in their game designs while failing to provide:

     a.  warnings of the use of operant conditioning behavior modification systems;
     b. lack of informed consent to operant conditioning being used in the game;
     c. robust age verification;
     d. effective parental controls;
     e. the removal of barriers to the enactment of parental controls;
     f. warnings of health effects of use and extended use upon sign-up;
     g. opt-in restrictions to the length and frequency of sessions;
     h. self-limiting tools including, but not limited to, session time notifications, warnings, or reports;
     i. tools to restrict and/or block usage during certain times of day (such as during school hours or late at night); and
     j. self-imposed limits for microtransactions.

708.   As a direct and proximate result of Defendants' egregious conduct in prioritizing profit at the expense of minors' mental health, and with knowledge of the attendant risks and Defendants' failure to mitigate those risks, Plaintiff is entitled to an award of exemplary and punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future. Accordingly, Plaintiff requests actual and punitive damages as authorized by Ohio law.

## **PRAYER FOR RELIEF**

709.   WHEREFORE, Plaintiff Champion Local School District, for the stated causes of action, prays for judgment against all Defendants as follows:

**b.** For damages to be determined by the jury, in an amount exceeding the minimum jurisdictional requirement of this Court, and adequate to compensate Plaintiff for all injuries and damages sustained;

**c.** For all general and special damages caused by the conduct of the Defendants;

**d.** For the costs of litigating this case;

**e.** For all pre-judgment and post-judgment interest;

**f.** For Plaintiff's costs of suit herein;

**g.** For injunctive relief;

**h.** For **attorneys' fees;**

**i.** **For exemplary and/or punitive damages according to proof at the time of trial; and**

**j.** **For such other and further relief, whether at law or in equity, which this Court deems just and proper.**

Respectfully submitted, this 21st  day of February, 2026.

BULLOCK LEGAL GROUP, LLC

*/s/ Carasusana B. Wall*

**BULLOCK LEGAL GROUP, LLC**

Carasusana B. Wall (OH0090234)
Ameena Alauddin (OH 102588)
Tina Bullock (GA121791) (*PHV Forthcoming*)
3662 Cedarcrest Road, Suite 320
Acworth, Georgia 30101
(833) 853-4258
(470) 412-6708 (facsimile)
Cara@bullocklegalgroup.com
Ameena@bullocklegalgroup.com

184

Tina@bullocklegalgroup.com

*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

The undersigned hereby demands a trial by jury as to all issues so triable.

Respectfully submitted, this 21st  day of February, 2026.

BULLOCK LEGAL GROUP, LLC

*/s/ Carasusana B. Wall*

**BULLOCK LEGAL GROUP, LLC**

Carasusana B. Wall (OH0090234)
Ameena Alauddin (OH 102588)
Tina Bullock (GA121791) (*PHV Forthcoming*)
3662 Cedarcrest Road, Suite 320
Acworth, Georgia 30101
(833) 853-4258
(470) 412-6708 (facsimile)
Cara@bullocklegalgroup.com
Ameena@bullocklegalgroup.com
Tina@bullocklegalgroup.com

*Counsel for Plaintiff*